MERRIT MARTIN AND OTHERS, PLAINTIFFS IN ERROR, *v.* THE LESSEE OF WILLIAM C. H. WADDELL, DEFENDANT IN ERROR.

Ejectment for one hundred acres of land, covered with water, in Raritan bay, in the township of Perth Amboy, in the state of New Jersey. The land claimed lies beneath the navigable waters of the Raritan river and bay, where the tide ebbs and flows; and the principal right in dispute was the property in the oyster fisheries in the public rivers and bays of East New Jersey. The claim was made under the charters of Charles the Second to his brother the Duke of York, in 1664 and 1674, for the purpose of enabling him to plant a colony on the continent of America. The land in controversy is within the boundaries of the charters, and in the territory which now forms the state of New Jersey. The territory in the grant, by succeeding conveyances, became vested in the proprietors of East Jersey, who conveyed the premises in controversy to the defendant in error. The proprietors, by the terms of the grant to them, were originally invested with all the rights of government and property which were conferred on the Duke of York. Afterwards, in 1702, the proprietors surrendered to the crown all the powers of government, retaining their rights of private property. The defendant in error claimed the exclusive right to take oysters in the place granted to him, by virtue of his title under the proprietors The plaintiffs in error, as the grantees of the state of New Jersey, under a law of that state passed in 1824, and a supplement thereto, claimed the exclusive right to take oysters in the same place. The point in dispute between the parties depended upon the construction and legal effect of the letters patent to the Duke of York, and of the deed of surrender, subsequently made by the proprietors.

The right of the King of Great Britain to make this grant to the Duke of York, with all of its prerogatives and powers of government, cannot at this day be questioned.

The English possessions in America were not claimed by right of conquest, but by right of discovery. According to the principles of international law, as then understood by the civilized powers of Europe, the Indian tribes in the new world were regarded as mere temporary occupants of the soil; and the absolute rights of property and dominion were held to belong to the European nations by which any portion of the country was first discovered.

The grant to the Duke of York was not of lands won by the sword, nor were the government and laws he was authorized to establish intended for a conquered people.

The country granted by King Charles the Second to the Duke of York, was held by the king in his public and regal character, as the representative of the nation; and in trust for them. The discoveries made by persons acting under the authority of the government were for the benefit of the nation; and the crown, according to the principles of the British constitution, was the proper organ to dispose of the public domain. Cited, Johnson *v.* M'Intosh, 8 Wheat. 595.

When the Revolution took place, the people of each state became themselves sovereign; and in that character held the absolute right to all their navigable waters, and the soils under them, for their own common use, subject only to the rights since surrendered by the constitution to the general government. A grant, therefore, made

[Martin et al. v. Waddell.]

by their authority, must be tried and determined by different principles from those which apply to grants of the British crown, where the title is held by a single individual in trust for the whole nation.

The dominion and property in navigable waters and the lands under them, being held by the king as a public trust, the grant to an individual of an exclusive fishery in any portion of it, is so much taken from the common fund intrusted to his care for the common benefit. In such cases, whatever does not pass by the grant remains in the crown for the benefit and advantage of the whole community. Grants of that description are, therefore, construed strictly; and it will not be presumed that the king intended to part from any portion of the public domain, unless clear and special words are used to denote it.

The rivers, bays, and arms of the sea, and all the prerogative rights within the limits of the charter of King Charles, undoubtedly, passed to the Duke of York, and were intended to pass, except those saved in the letters patent.

The questions upon this charter are very different. It is not a deed conveying private property, to be interpreted by the rules applicable to cases of that description. It was an instrument upon which was to be founded the institutions of a great political community; and in that light it should be regarded and construed.

The object in view of the letters patent appears on the face of them. They were made for the purpose of enabling the Duke of York to establish a colony upon the newly discovered continent, to be governed as nearly as circumstances would permit according to the laws and usages of England; and in which the Duke, his heirs, and assigns, were to stand in the place of the king, and administer the government according to the principles of the British constitution; and the people who were to plant this colony, and to form this political body over which he was to rule, were subjects of Great Britain, accustomed to be governed according to its usages and laws.

The land under the navigable waters within the limits of the charter passed to the grantee, as one of the royalties incident to the powers of government, and were to be held by him in the same manner, and for the same purposes that the navigable waters of England and the soils under them are held by the crown. The policy of England, since Magna Charta—for the last six hundred years—has been carefully preserved; to secure the common right of piscary for the benefit of the public. It would require plain language in the letters patent to the Duke of York, to persuade the Court that the public and common right of fishing in navigable waters, which has been so long and so carefully guarded in England, and which was preserved in every other colony founded on the Atlantic borders, was intended in this one instance to be taken away. There is nothing in the charter that requires this conclusion.

The surrender by the proprietors to Queen Anne, in 1702. was of "all the powers, authorities, and privileges of and concerning the government of the province;" and the right in dispute in this case was one of these privileges. No words are used for the purpose of withholding from the crown any of its ordinary and well-known prerogatives. The surrender, according to its evident object and meaning, restored them in the same plight and condition in which they originally came to the hands of the Duke of York. When the people of New Jersey took possession of the reins of government, and took into their own hands the power of sovereignty, the

[Martin et al. *v.* Waddell.]

prerogatives and regalities which before belonged either to the crown or the parliament, became immediately and rightfully vested in the state.

Quere. Whether on a question which depends not upon the meaning of instruments formed by the people, of a sta : or by their authority, but upon the letters patent granted by the British crown, under which certain rights are claimed by the state, on one hand, and by private individuals, on the other, if the Supreme Court of the state of New Jersey had been of opinion that upon the face of the charter the question was clearly in favour of the state, and that the proprietors holding under the letters patent had been deprived of their just rights by the erroneous judgment of the State Court, it could be maintained that the decision of the Court of the state on the construction of the letters patent bound the Supreme Court of the United States. The decision of the State Court upon the letters patent by which the province was originally granted by the King of Great Britain, is unquestionably entitled to great weight. If the words of the letters patent had been more doubtful, Quere, if the decision of a State Court on their construction, made with great deliberation and research, ought to be regarded as conclusive.

IN error to the Circuit Court of the United States for the district of New Jersey.

The defendant in error, the lessee of William C. H. Waddell, instituted, to April term, 1835, in the Circuit Court of the United States for the district of New Jersey, an action of ejectment, against Merrit Martin and others, for the recovery of certain land covered with water, situated in the Raritan bay, below high-water mark, in the state of New Jersey. The defendants appeared to the suit; and at April term, 1837, the cause was tried by a jury, who found a special verdict, on which judgment was afterwards entered for the plaintiff; from which judgment the defendants prosecuted this writ of error.

The case was argued by Mr. Wall, and Mr. Wood, for the plaintiffs in error; and by Mr. Ogden and Mr. Wright, for the defendant.

The special verdict found that on the 12th day of March, 1664, certain letters patent, duly executed, were granted by Charles the Second, then King of England, to James, Duke of York; and set forth the letters patent at large. The letters patent stated that the King, "For divers good causes and considerations us thereunto moving, having of our special grace, certain knowledge, and mere motion, given and granted, and by these presents, for us, our heirs and successors, do give and grant unto our dearest bro-

ther, James, Duke of York, his heirs and assigns, all that part of the main land of New England, beginning at a certain place called or known by the name of St. Croix, next adjoining to New Scotland, in America; and thence extending along the seacoast, unto a certain place called Petuaquine, or Pemaquid, and so up the river thereof, to the farthest head of the same, as it tendeth northward; and extending from thence to the river of Kenne-beque, and so upwards by the shortest course to the river of Canada northward; and also all that island or islands, commonly called by the several name or names of Matowacks or Long Island, situate, lying and being towards the west of Cape Cod, and the Narrow Higansetts, abutting upon the main land between the two rivers there, called or known by the several names of Connecticut or Hudson rivers; together also with the said river called Hudson river, and the lands from the west side of Connecticut to the east side of Delaware bay   And also all those several islands called or known by the names of Martin's Vineyard and Nantucks, or otherwise Nantuckett, (whereof the tenements aforesaid, with the appurtenances in the declaration aforesaid mentioned are parcel;) together with all the lands, islands, soils, rivers, harbours, mines, minerals, quarries, woods, marshes, waters, lakes, fishings, hawkings, huntings, and fowlings, and all other royalties, profits, commodities and hereditaments to said several islands, lands, and premises belonging and appertaining, with their and every of their appurtenances, and all our estate, right, title, interest, benefit, advantage, claim and demand, of, in, or to the said lands and premises, or any part or parcel thereof, and the reversion and reversions, remainder and remainders, together with the yearly and other the rents, revenues, and profits, of all and singular the said premises, and of every part and parcel thereof, to have and to hold all and singular the said lands, islands, hereditaments, and premises, with their, and every of their appurtenances, hereby given and granted, or hereinbefore mentioned, to be given and granted unto our dearest brother James, Duke of York, his heirs and assigns forever; to be holden of us, our heirs and successors, as of our manor of East Greenwich, in our county of Kent, in free and common soccage, and not in capitie, nor by knight service, yielding and rendering.   And the same James, Duke of York, doth for himself, his heirs and assigns, covenant and pro-

[Martin et al. *v.* Waddell.]

mise to yield and render unto our heirs and successors, of and for the same, yearly and every year, forty bea: er-skins, when they shall be demanded, or within ninety days after.    And we do further of our special grace, certain knowledge, and mere mo- tions, for us, our heirs and successors, give and grant unto our said dearest brother James, Duke of York, his heirs, deputies, agents, commissioners and assigns, by these presents, full and absolute power and authority to correct, punish, pardon, govern, and rule all such the subjects of us, our heirs and successors, as shall from time to time adventure themselves into any the parts or places aforesaid, or that shall or do at any time hereafter inhabit within the same, according to such laws, orders, ordinances, directions and instruments, as by our said dearest brother or his assign, shall be established, and in defect thereof, in case of necessity, according to the good discretions of his deputies, commissioners, officers or assigns respectively; as well in all causes and matters capital and criminal, as civil, both marine and others, so always as the said statutes, ordinances and proceedings, be not contrary to, but as near as conveniently may be, agreeable to the laws, statutes and government of this our realm of England; and saving and reserving to us, our heirs and successors, the receiv- ing, hear...g, and determining of the appeal and appeals of all or any person or persons of, in, or belonging to the territories or islands aforesaid, in or touching any judgment or sentence to be there made or given.   And further, that it shall and may be law- ful, to and for our said dearest brother, his heirs and assigns, by these presents, from time to time, to nominate, make, constitute, ordain, and confirm by such name or names, stile or stiles as to him or them shall seem good, and likewise to revoke, discharge, change and alter, as well all and singular, the governors, officers and ministers, which hereafter shall be by him or them thought fit and needful to be made or used within the aforesaid parts and islands; and also to make, ordain and establish all manner of orders, laws, directions, instructions, forms and ceremonies of government and magistracy, fit and necessary for and concerning the government of the territories and islands aforesaid, so always that the same be not contrary to the laws and statutes of this our realm of England, but as near as may be agreeable thereunto, and the same at all times hereafter to put in execution, or abro-

gate, revoke, or change, not only within the precincts of the said territories or islands, but also upon the seas, in going and coming to and from the same, as he or they in their good discretion shall think to be fittest for the good of the adventurers and inhabitants there; and we do further, of our own special grace, certain knowledge, and mere motions, grant, ordain, and declare that such governors, officers and ministers, as from time to time shall be authorized and appointed in manner and form aforesaid, shall and may have full power and authority to use and exercise martial law, in cases of rebellion, insurrection, and mutiny, in as large and ample a manner as our lieutenants in our counties within our realm of England have or ought to have, by force of their commission of lieutenancy, or any law or statute of this our realm; and we do further, by these presents, for us, our heirs and successors, grant unto our said dearest brother James, Duke of York, his heirs and assigns, that it shall and may be lawful to and for the said James, Duke of York, his heirs and assigns, in his or their discretion, from time to time, to admit such and so many person or persons to trade and traffic unto and within the said territories and islands aforesaid; and into every or any part or parcel thereof, and to have, possess, and enjoy any lands or hereditaments in the parts and places aforesaid, as they shall think fit, according to the laws, orders, constitutions, and ordinances by our said brother, his heirs, deputies, commissioners, and assigns, from time to time to be made and established by virtue of, and according to the true intent and meaning of these presents; and under such conditions, reservations, and agreements as our said brother, his heirs or assigns, shall set down, order, direct and appoint, and not otherwise, as aforesaid; and we do further of our special grace, certain knowledge, and mere motion, for us our heirs and successors, give and grant unto our said dearest brother, his heirs and assigns, by these presents, that it shall and may be lawful to and for him, them, or any of them at all, and every time and times hereafter, out of any of our realms or dominions whatsoever, to take, lead, carry, and transport in and into their voyages, and for and towards the plantations of our said territories and islands, all such and so many of our loving subjects, or any other strangers being not prohibited or under restraint, that will become our loving subjects, and live under our allegiance, as shall willingly

[Martin et al. *v.* Waddell.]

accompany them in the said voyages; together with all such clothing, implements, furniture, and other things usually transported, and not prohibited, as shall be necessary for the inhabitants of the said islands and territories, and for their use and defence thereof, and managing and carrying on the trade with the people there; and in passing and returning to and fro, yielding and paying to us, our heirs and successors, the customs and duties, due and payable, according to the laws and customs of this realm.

And we also, for us, our heirs, and successors, grant to our said dearest brother James, Duke of York, his heirs and assigns, and to all and every such governor or governors, or other officers or ministers as by our said dear brother, his heirs or assigns, shall be appointed, to have power and authority of government and command in or over the inhabitants of the said territories or islands, that they and every of them, shall and lawfully may from time to time, and all times hereafter, forever, for their several defence and safety, encounter, expulse, repel, and resist, by force of arms, as well by sea as by land, and all ways and means whatsoever, all such person and persons, as without the special license of our said dearest brother, his heirs or assigns, shall attempt to inhabit within the several precincts and limits of our said territories and islands, and also all and every such person and persons whatsoever, as shall enterprise, or attempt at any time hereafter, the destruction, invasion, detriment, or annoyance to the parts, places, or islands aforesaid, or any part thereof; and, lastly, our will and pleasure is, and we do hereby declare and grant, that these our letters patent, or the enrolment thereof, shall be good and effectual in the law, to all intents and purposes whatsoever, notwithstanding the not reciting or mentioning of the premises or any part thereof, or the metes or bounds thereof, or of any former or other letters patent or grants heretofore made or granted of the premises, or of any part thereof, by us or of any of our progenitors, unto any other person or persons whatsoever, bodies politic or corporate, or any act, law, or other restraint, uncertainty, or imperfection whatsoever, to the contrary in anywise notwithstanding; although express mention of the true yearly value or certainty of the premises, or any of them, or of any other gifts or grants by us, or by any of our progenitors or

predecessors heretofore made, to the said James, Duke of York, in these presents is not made, or any statute, act, ordinance, provision, proclamation, or restriction heretofore had, made, enacted, ordained, or provided, or any other matter, cause, or thing whatsoever, to the contrary thereof in anywise notwithstanding."

The special verdict further found that, on the 23d day of June, 1664, James, Duke of York, by indenture conveyed to Lord Berkley and Sir George Carteret, for a competent sum of money, all that tract of land adjacent to New England, lying and being to the westward of Long Island, and Manhitas Island, and bounded on the east, part by the main sea and part by Hudson's river, having upon the west, Delaware bay or river, and extending southward to the main ocean as far as Cape May, at the mouth of Delaware bay, and to the northward as far as the northernmost branch of the said bay or river of Delaware, which is in forty-one degrees and forty minutes of latitude, and crossing over thence in a straight line to Hudson's river, in forty-one degrees of latitude; which said tract of land so as aforesaid demised, was, by the terms of the said indenture, thereafter to be called New Cæsarea or New Jersey, and was a portion and part of the said tract of land, so as aforesaid granted by the said Charles the Second to the said James, Duke of York, and of which said tract so as aforesaid demised, the tenants aforesaid, with the appurtenances in the declaration aforesaid mentioned, are parcel. To have and to hold to the said John, Lord Berkley, and Sir George Carteret, from the day next before the day of the date of the said indenture, for one whole year thence next ensuing. By virtue whereof, the said John, Lord Berkley, and Sir George Carteret, into the tenements so as aforesaid demised with the appurtenances entered, and were possessed thereof, for the term aforesaid, and being so thereof possessed, afterwards to wit, on the twenty-fourth day of the same month of June, in the year last aforesaid, by a certain indenture made between the said James, Duke of York, of the one part, and the said John, Lord Berkley, and Sir George Carteret of the other part, bearing date the same day and year last aforesaid, for and in consideration of a competent sum of good and lawful money of England, to the said James, Duke of York, paid by the said John, Lord Berkley, and the said Sir George Carteret, he, the said James, Duke of

York, granted, bargained, sold, leased, and confirmed to the said John, Lord Berkley and Sir George Carteret, and to their heirs and assigns forever, they then being in their actual possession, the tenements last aforesaid, with the appurtenances, so as aforesaid, to be called New Cæsaræa or New Jersey; and also, all rivers, mines, minerals, woods, fishings, hawkings, huntings, and fowlings, and all other royalties, profits, commodities, and heredinaments whatsoever, to the said land and premises belonging, or in anywise appertaining, with their and every of their appurtenances, in as full and ample a manner as the same were granted to the said James, Duke of York, by the before-recited letters patent, to have and to hold the tenements last aforesaid, with the appurtenances and every of them, unto the said John, Lord Berkley, and Sir George Carteret, their heirs and assigns forever.

The special verdict further found that afterwards, on the 29th day of June, 1674, King Charles the Second granted to James, Duke of York, and on the 28th and 29th days of July, 1674, James, Duke of York, for a competent sum of money granted and conveyed to Sir George Carteret, all that tract of land adjacent to New England, lying and being to the westward of Long Island and Manhitas Island, and bounded on the east, part by the main sea, and part by Hudson's river, extending southward as far as a certain creek, called Barnagat, being about the middle between Sandy Point and Cape May, and bounded on the west, in a straight line from said creek, called Barnagat, to a certain creek in Delaware river, called Renkokus Kill, and thence up the said Delaware river, to the northernmost branch thereof, in latitude forty-one degrees and forty minutes, and on the north, crossing over in a straight line to Hudson's river, in forty-one degrees of latitude, (of which said tract of land and premises last mentioned and demised, the tenements aforesaid, with the appurtenances in the declaration aforesaid mentioned are parcel,) together with all mines, minerals, woods, rivers, fishings, hawkings, huntings, and fowlings, and all the royalties, profits, commodities, and hereditaments whatsoever, to the said last-mentioned tenements belonging, or in anywise appertaining: with their and every of their appurtenances, in as full and ample a manner as the same were granted to the said James, Duke of York, by the before-recited letters patent; to have and to hold the tenements last aforesaid

with the appurtenances, and every of them unto the said Sir George Cartaret, his heirs and assigns forever. And, further, that previous to the execution of the said last-mentioned letters patent, and of the said several herein before-mentioned indentures following the same, to wit, on the thirteenth day of June, in the year of our Lord one thousand six hundred and seventy-four, by a certain proclamation published and promulged on the same day and year last aforesaid, by the said Charles the Second; he, the said Charles the Second, did command and charge all persons whatsoever, inhabiting the said province of New Cæsaræa or New Jersey, whereof the tenements aforesaid, with the appurtenances in the declaration aforesaid mentioned, are parcel, to yield obedience to the laws and government which were or should be thereafter established in the said province, by the said Sir George Carteret, (who, in the words of the said proclamation, had the sole power under him, the said Charles the Second, to settle and dispose of the said province, upon such terms and conditions as to him, the said Sir George Carteret, should appear fit,) upon pain of incurring the high displeasure of the said Charles the Second, and of being proceeded against according to law.

The jury further found that afterwards by conveyances from Sir George Carteret to divers persons, and by conveyances from Lord Berkley and the will of Sir George Carteret and sundry mesne conveyances and deeds of partition, set forth in the special verdict, and by a deed of confirmation from the Duke of York, the part of the province of New Jersey, called East New Jersey, of which the premises in this ejectment are part, became vested in twenty-four proprietors, and all rights, benefits, and advantages, and all and every the isles, islands, rivers, mines, minerals, woods, fishings, hawkings, huntings, fowlings, and all other royalties, governments, powers, forts, franchises, harbours, profits, commodities, and hereditaments whatsoever, unto the said easterly part of the said province of New Jersey, belonging or in anywise appertaining, with their, and every of their appurtenances; and all the estate, right, title, and interest, claim and advantage, whatsoever, as well in law as in equity, of the said grantors, and each and every of them, of, in, unto, and out of said easterly part of the said province of New Jersey, and of every part and parcel thereof, and the reversion and reversions,

remainder and remainders, of the same, and of every part and parcel thereof, and all the rents, duties, services, reserved upon any estates or grants theretofore made by the said Lord Berkley and Sir George Carteret, or by any persons claiming any estate, interest, or authority, from, by, or under either of them, of any part of the said premises thereby conveyed unto the said Sir George Carteret; to have and to hold to the said Sir George Carteret, and to his heirs and assigns in severalty, to the sole and only use of the said Sir George Carteret, his heirs and assigns forever; and that it was further agreed and covenanted in the said indenture, quintipartite, that the part of the said province of New Jersey, therein conveyed to the said Sir George Carteret should thereafter be known and distinguished by the name of East New Jersey.

The jurors further found that on the fourteenth day of March, 1682, the Duke of York, in consideration of a competent sum of money for the better extinguishing of all such claims and demands as the said Duke of York, and his heirs might in anywise have, of, or in the premises, with the appurtenances, called East New Jersey, as aforesaid, did grant, bargain, sell, release, convey, and confirm unto the said twenty-four proprietors, their heirs and assigns, all the premises, with the appurtenances so as aforesaid, called East New Jersey, and every part and parcel thereof, together with all islands, bays, rivers, waters, forts, mines, minerals, quarries, royalties, franchises, whatsoever, to the same belonging, or in anywise appertaining, and also, the free use of all bays, rivers, and waters leading unto, or lying between the said last-mentioned premises, or any of them, for free trade, navigation, fishery, or otherwise, to have and to hold, to the said twenty-four proprietors, their heirs and assigns forever to the only proper use and behoof of the said twenty-four proprietors, their heirs and assigns forever. And that the said Duke of York, by the said last-mentioned indenture, did also grant, transfer, and assign to the said twenty-four proprietors, and to their heirs and assigns, proprietors of the said province of East New Jersey for the time being, all and every such, and the same powers, authorized jurisdictions, governments, and other matters and things whatsoever, which by the said several above-recited letters patent, from the said Charles the Second, to the said Duke of York, or either of them, were granted or

intended to be granted, to be exercised by the said Duke of York, his heirs, or assigns, his or their agents, or officers in or upon the said premises, by the said last-mentioned indenture, confirmed or intended to be thereby confirmed, and every of them, to be held, enjoyed, exercised, and executed by the said twenty-four proprietors, their heirs and assigns, proprietors of the said last-mentioned premises, for the time being, as fully, amply, to all intents, constructions, and proposes, as the said Duke of York, or his heirs could or ought to hold, enjoy, use, exercise, or execute the same by force and virtue of the said several above-recited letters patent or otherwise, howsoever.

The jurors further found that King Charles the Second, on the twenty-third day of November, 1683, by an instrument in writing, duly executed, and reciting the said last-mentioned indenture, from the said Duke of York, to the said twenty-four proprietors, did recognise their right to the soil and government of the said province of East New Jersey, and did strictly charge and command the planters and inhabitants, and all other persons concerned in the same, to submit and yield all due obedience to the laws and government of the said twenty-four proprietors, their heirs, and assigns, as absolute proprietors and governors thereof, who in the words of the said instrument in writing, had the sole power and right, derived under the said Duke of York, from him the said Charles the Second, to settle and dispose of the said province of East New Jersey, upon such terms and conditions as to the twenty-four proprietors, their heirs and assigns, should seem meet, as also, to their deputy or deputies, agents, lieutenants, and officers lawfully commissioned by them, according to the powers and conditions granted to them.

The jurors further found that afterwards, on the fifteenth day of April, 1702, the said twenty-four proprietors, and the other persons, in whom the whole estate, right, title, and interest in the said province of East New Jersey, were vested at the said last-mentioned date as proprietors thereof, by an instrument in writing, under their hands and seals, bearing date the same day and year last aforesaid, did for themselves, and their heirs, surrender and yield up unto Anne, Queen of England, &c., and to her heirs and successors, all the powers and authorities in the said letters patent granted, to correct, furnish pardon, govern, and rule

[Martin et al. *v.* Waddell.]

all or any of her said majesty's subjects or others, who then were as inhabited or thereafter might adventure into or inhabit within the said province of East New Jersey; and also to nominate, make, constitute, ordain, and confirm any laws, orders, ordinances, directions, and instruments for those purposes or any of them, and to nominate, constitute or appoint, revoke, discharge, change, or alter any governor or governors, officers or ministers, which were or should be appointed within the said province, and to make, ordain, and establish, any orders, laws, directions, instruments, forms or ceremonies of government and magistracy, for or concerning the same, or on the sea in going to or coming from the same, or to put in execution or abrogate, revoke or change such as were already made for or concerning such government or any of them; and also all the powers and authorities by the said letters patent granted, to use and exercise martial law in the said province of East New Jersey, and to admit any person or persons to trade or traffic there; and if encountering, repelling and resisting by force of arms, any person or persons attempting to inhabit there without the license of them, the said proprietors, their heirs and assigns, and all other the powers, authorities, and privileges of, and concerning the government of the province last aforesaid, or the inhabitants thereof, which were granted or mentioned to be granted by the said several above-recited letters patent, or either of them. And that the same Queen Anne, afterwards, to wit, on the seventeenth day of the same month April, in the year last aforesaid, did accept of the said surrender of the said powers of government, so made by the said proprietors in and over the premises last aforesaid.

And the jurors further found that afterwards, on the 25th of November, 1824, the legislature of the state of New Jersey passed an act which declared that the shore and land covered by the waters of the sound and Raritan river, in the township of Perth Amboy, should be set apart for the purpose of planting and growing oysters, subject to a rent to be paid to the state of New Jersey, and authorized the commissioners, acting under the law, to permit the owners of the adjacent land to stake off lots within the surveys of the commissioners; which surveys of the land covered with water, the commissioners were directed to make. The jury found that the defendants in the ejectment, having com-

plied with the regulations of the act of Assembly, were in possession of the lands covered with water, for the recovery of which the ejectment was brought.

The jury found the premises in dispute are situated beneath the waters of the Raritan river and bay, where the tide ebbs and flows. That the plaintiffs in the ejectment claimed title under regular conveyances from those to whom the proprietors of East Jersey had given deeds in fee-simple for the premises claimed by them.

The cause was argued at large, by the counsel for the plaintiffs and the defendants, on many points; but the decision of the Supreme Court having been given exclusively on the questions presented on the construction and effect of the letters patent, and the effect of the surrender by the proprietors of East Jersey to Queen Anne, in 1702, the arguments of counsel on these questions only are given.

Mr. Wood, (with whom was Mr. Wall,) for the plaintiffs in error.

It is admitted that the King of Great Britain, Charles the Second, had the power to grant the territory of New Jersey, as private property, and that he did so grant it, including private rivers, ordinary mines, &c. This territory was discovered and held, not for revenue, but for colonization and settlement. After the grant, it was held by the proprietors as private property detached from government, and not as demesne lands of the government. This is conformable to usage. The proceeds of sales of the territory went into the private purse of the proprietors, and was not applied to the fiscal purposes of the government. Taxes were resorted to under the proprietary government to raise revenue.

It is also admitted, that the king had power to create colonial and palatine governments, and jurisdictions. This power was disputed and denied after the Revolution of 1688; but this did not operate retrospectively, and destroy such patents as were already granted.

It is also admitted that the surrender to Queen Anne embraced no private property; but that the same was all reserved to the proprietors.

To enable the plaintiff below to recover, he must be able to maintain two positions, 1st, That he has a possessory title to the

premises in question, the soil of this navigable water: and, 2dly, That there was not a common right of fishery in the people at large in the premises in question.

In ejectment, the party must recover possession of the soil, and therefore he must show a possessory title.

If there was in the people of New Jersey a common right of fishery, the legislature exercising plenary sovereignty could unquestionably dispose of it, modify it, lease it, and exercise every act of ownership and control over it. Of course, the lease of it under the statute to the defendant would be good. The use and occupancy of the premises by the defendant, is only commensurate with that right. He does not pretend to take absolute possession of the soil. He cannot be ejected from a possession commensurate with his right.

Has the plaintiff shown a possessory title to the soil?

All titles in New Jersey go back to the grant of Charles the Second to the Duke of York; and much depends upon the sound construction of this grant, in reference to the premises in question.

There are, according to our view, two prominent errors in that opinion of which we complain; and it may contribute to a right understanding of the argument to point them out at the threshold.

First, In a grant by the king of prerogative rights to a subordinate governor, the regalia thus granted continue attached to the government, in the same way as when they were in the hands of the crown. In the grant of the right to an individual, they become mere private property—private franchises. The distinction, as will be shown, was in the mind of the Circuit Court; but it did not make such a vivid impression as to induce the Court to carry it out to its legitimate results.

Secondly, It is thought the Court erred in clothing the king with too despotic a power over the territory in question—treating him as an absolute despot, independent of parliament, and in considering the grant as transferring to the duke such absolute powers.

It is admitted this royal grant has a double aspect—a public and a private aspect. The plaintiff below must succeed in bringing his claim under the second point if he succeed at all.

This country was held by right of discovery, and not conquest. It was only retaken from the Dutch and claimed on the ground

of this prior right of discovery. Smith's New Jersey Laws, 36, 37; 1 Story on the Constitution, 136; Chitty's Prerog. 29, 30; Canal Commissioners v. The People, 5 Wend. 445; Bogardus v. Trinity Church, 4 Paige, 178.

The inhabitants emigrating to this country, carried with them the laws of England, so far as they were applicable to their situation. 4 Paige, 178; 2 P. Wms. 75; 2 Salk. 411; Clark's Colonial Law, 7; 1 Chalmers's Opinions, 198; 2 Chalmers's Opinions, 202. The use of fisheries and rivers, as common property, was peculiarly applicable to their situation.

If claimed by conquest, the English when invited to settle there, would carry with them their own laws and constitutional rights. 1 Story on the Constitution, 111, and cases cited.

Again, If claimed by conquest, even as to the conquered, the moment English law is introduced by proclamation or otherwise, it is irrevocable by the king. Cowp. R. 213. Here it was introduced in the royal grant itself.

The great principles of British liberty must be considered, as accompanying this royal charter, and it must be construed accordingly.

It is matter of history, that the Stuarts, to encourage emigration, introduced into these colonies the broadest principles of British liberty. The fundamental constitutions of New York show this. The people have always appealed to Magna Charta, as the foundation of American as well as British liberty.

There is no language in this royal grant that will pass the sea and its arms as private property.

We must here treat it in the same way as if the king had granted a tract of land to a private individual. The plaintiff below can derive no aid from its being a public grant of territory and government. In that sense, we admit, the rivers passed; and will presently show how they passed.

We contend, first, that the sea and its arms were part of the regalia or prerogative rights of the crown.

And, secondly, that they could not, upon a sound construction of this charter, pass as private property to the Duke in his private capacity.

First, They are always called royal rivers. Banne Case, Davies' Rep. 155; Shultze, Aouatic Rights, 1 Bl. Com. 264. Pre-

[Martin et al. *v.* Waddell.]

rogative rights are such as are pre-eminently in the king by way of preference over his subjects. Such as royal mines, wrecks, royal fish.

Such rights as are held by the king on the same common ground as a subject holds and are not prerogative rights. Such, for instance, as private rivers and the ordinary demesne lands of the crown. Chitty's Prerog. 4. Royal rivers are pre-eminently in the king. Private rivers are presumed to be owned by the adjacent proprietors. Not so with public rivers; they are, at common law, in the king.

Again, The sea and its arms are peculiarly and pre-eminently in the king, in respect to their uses; all of which, at common law, are public, and they are held by the king for the public benefit, viz., navigation, fishery, the mooring of vessels, which is subject to the jus preventionis. Angel on Tide-waters, 158.

The private rights arise only after the character is changed, as in the case of alluvion, wharfing out, draining, &c. Such rights until consummated are mere possibilities.

The right in the sea and its arms centres in the king for conservation of the public use. As a highway is called in the law the king's highway.

The counsel for the proprietors in Moody *v.* Arnold contended there was no distinction between the rights of the king, inasmuch as they were all held by the king, under his prerogative or political capacity. 1 Halsted, 58. This argument confounded the distinction between the capacity in which the king holds, and the rights held by him. Though he holds all in his political capacity, he holds some pre-eminently as regalia or royal rights. General words, "rivers, mines," &c., do not pass royal rivers, royal mines. Cases of Mines, Plowd. 333, 334, 336; Alton Wood's Case, 1 Co. 46 b; 16 Vin. 597, Prerog. Ka. sec. 27; Chitty's Prerog. 392; Canal Commissioners *v.* The People, 5 Wend. 451.

Nothing passes against the king by implication. Banne Case, Davies's Rep. 157; Jure Coronæ, 117; 7 Conn. Rep. 200. The term "rivers" will not pass the soil. Davies's Rep. 154. The terms "ex certa scientia," &c., never have the effect to enlarge the construction so as to embrace prerogative rights, in such general terms, Alton Wood's Case, 1 Co. 46 b, and the above case in 16 Viner.

Such general terms as "all royalties," will not have the effect.

7 Conn. Rep. 200.   But in the grant in question, it is all royalties appurtaining to the premises granted. "Appurtenances" will pass nothing, except such things as are strictly appurtenant. Chitty's Prerog. 392.   It will not be pretended that royal rivers are appurtenant to the adjacent private land.

These doctrines were fully maintained in this Court, in the case of Charles River Bridge, in 11 Peters.   It will also be borne in mind, that this ancient grant is to be construed in reference to the rights of the prerogative, as then understood

We shall now view this royal charter in its other aspects as a great state paper, containing a transfer of territory with the powers of government, according to the principles of the British constitution.

In this respect it is to be construed upon liberal principles of public law.   We admit that under this aspect of the case, the regalia passed.   And we contend that, if the grants did contain language sufficient to pass them on technical grounds, they will be construed to pass to the duke as the regalia of the government; he standing in the place of the crown, to hold them as the king held them.   All the regalia, such as the sea and its arms, or the royal rivers, royal mines, wrecks, &c., &c., were held by the duke and the proprietory government under him, as attached to the government.   The duke being in the place of the king in respect to them.   1 Halsted, 77, 78.

This construction is supported by considering, First, The character and purpose in and for which the territory was held by the king.   Secondly, The design of the royal grants.

First, The territory was held and could only be held for settlement by colonization or otherwise.   If held to lie idle, there would be the same objection to it as to the Indian title.

Second, The design of the grant was to colonize and settle with British subjects, in order to consummate the title and extend the British dominions.   The purpose was, as the grant purports on its face, to introduce British law, and the British constitution.

To effect these great objects, it was indispensable that all the regalia or royal rights should be held here as they were in England, attached to the government, and for the benefit of the people.

[Martin et al. *v.* Waddell.]

Prerogative rights are held for the benefit of the community; more especially those charged with the common use, as royal rivers. Chitty's Prerog. 4; 4 T. R. 410; The Elisha, 5 Rob. Adm. Rep. 159. According to this view of the grant, the sea and its arms may correctly be said to be appurtenant to the government and territory as a colonial domain.

This construction is illustrated by the cases of counties palatine.

The count palatine derives his name, a pelatio, from his standing in the place of the king, and indictments are charged against his peace. 4 Inst. 204. Hence lands in a county palatine, when granted by the count, pass within livery. 4 Inst. 206. Lands may be holden of him in capite, though they cannot be of a private subject. Davies's Rep. 181.

The regalia are not private, as they would be, in the hands of an ordinary subject. The count palatine can establish Courts of justice.

The regalia in a county palatine are incident to the government. Boss *v.* Bishop of Durham, 2 Bulst. 226, 227. It is sufficient to prescribe for franchises not granted—by showing a county palatine. 4 Com. Dig. Franchise, D. 7.

A county palatine is an inferior subordinate jurisdiction in the heart of the kingdom, with mere judicial and administrative powers.

A colonial government extends over a large territory, and is clothed with high legislative and executive power as well as judicial—with complete, though subordinate sovereignty.

If the regalia pass in a county palatine, as incident to the subordinate jurisdiction, the reasons for passing them as incident to the colonial government, to be held and applied to the benefit of the colonists, applies with tenfold force.

The surrender by the proprietors of the government to Queen Anne, included a surrender of all the regalia, such as wrecks, royal rivers, &c. 1st, Impliedly. 2d, In express terms.

1st, Impliedly.—If the above view taken of the grant be correct, this follows of course :—

If these regalia were by the royal grant converted into mere private franchises in the hands of individuals, as private property, detached altogether from the government, as we have admitted.

to be in the case with the soil and private rivers, then they were not surrendered. If they continued concomitants of the government, then clearly they were surrendered. What is a surrender but a retransfer? If the regalia pass incidentally by the creation or transfer of the sovereign power, they will, of course, pass by the surrender or retransfer thereof. A king de facto takes the jure regalia. Chitt. Prerog. 205.

But there are in this surrender express terms, apt and sufficient to retransfer the regalia to the crown.

They surrender all powers, authorities, and privileges of and concerning the government, and the inhabitants thereof. Leaming and Spicer, 615.

"Privileges" embraces the regalia in their hands. It was so understood by the proprietors. Sec. 13. It is so used at common law. 7 Com. Dig. Prerog. D. 32.

If only the high political powers of government were designed to be surrendered, why was this language inserted in the surrender? The government itself embraces all these high political powers, and is senseless without them. All the minor jure regalia concerned the government and the inhabitants.

The protocol is referred to, Leaming and Spicer, 590, 596, wherein it is stated that the rights in the seas cannot well be circumscribed. The rights of the seas there referred to, were wrecks, royal fish, &c.

Now, any one familiar with the jurisprudence of New Jersey knows that the proprietors never claimed or pretended, after the surrender, to claim these rights. The error here arises from attending to the protocol or negotiation, instead of the surrender itself. The proprietors negotiated for a reservation of those rights, like the Duke of Athol. But though the commissioners were at first disposed to concede some of them, yet finally none of them were reserved in the surrender. But this attempt, on the part of the proprietors to procure such a reservation, shows they were satisfied that the surrender would pass them to the crown, unless an express reservation could be obtained.

In the construction of all ancient instruments, but more especially of public grants, long continued usage should have great influence.

Next as to the rights in the sea and its arms.

[Martin et al. *v.* Waddell.]

1. As to wrecks. · This is one of the minor regalia respecting property, and is often vested in the subject as a franchise. Lords of manors bordering on the sea frequently claim it. · Yet this was surrendered, and has been the subject of repeated regulation by statutes providing when and under what circumstances the proceeds shall be paid into the state exchequer. · Patterson's Laws, 385.

2. Ferries when established—wharves, ferry-stairs, piers, &c., stretch into the rivers and bays. If over a private river, the owner of the ferry would have to purchase the land of the owner of the river. No such claim to the public rivers has been set up by the proprietors.

3. Bridges. Toll bridges, and bridges connected with turnpikes, railroads, &c., when established over a public river, occupying the soil, would be an encroachment upon the rights of the proprietors, if they owned the bed of such river. Compensation in such cases is always made to the owners of private rivers and fast land; but none has been made to the proprietors as owners of the public rivers.

4. The right of the riparian proprietor to wharf out into the public river, is a local custom in New Jersey. How can the growth of such a custom be reconciled with the idea that the soil and fisheries in those public waters were the private property of the lords proprietors. ·

5. In all the public waters of the state they have two kinds of fisheries—common fisheries—and private or shore fisheries, belonging to the riparian owner. The latter is confined to fisheries for those kinds of fish which were usually taken by hauling the net upon the shore, and are called shore fisheries. By long usage, these kinds of fisheries have grown into private rights, belonging to the riparian owner, and have been recognised by repeated legislative acts. Bennet *v.* Boggs, 1 Baldwin's Rep. 70. Those common of fisheries and riparian several fisheries are all incompatible with the claims of the proprietors, who, under such claims would have had several fisheries in all the rivers, and disposed of them to their grantees.

The Delaware was by an early law declared to be a common fishery. But this grew out of the controversy with Pennsylvania, and was the assertion of a right as against them. The

same common rights of fishery have existed in all the other waters of the state.   Leaming and Spicer, 480.

6. The oyster fisheries are common in all the rivers and bays of the state, and have always been protected as such.

The acts recite the rights of the poor to take oysters, and protect them from encroachment by citizens of other states; all founded on the idea of common right.   1 Halsted, 90, 91; 1 Allison's N. J. Laws, 57, Preamble; 1 Pat. 203; 1 Nevile, 87.

It is not pretended that the proprietors have ever possessed or enjoyed any of the regalia since the surrender.   They have occasionally made a few grants which have extended over these public waters, but they have been very few.   Their grants have almost invariably been confined to the bank or margin of the public rivers.   See 4 Griffith's Law Register, 1292.   But in the few grants they have made, it is not pretended that the grantees have ever set up several fisheries for oysters, or floating fish; or claimed and exercised an exclusive right in any other way.

One would suppose, if the proprietors had claimed the regalia after the surrender, they would at once have asserted and exercised the right of extinguishing the Indian title, a prerogative right appertaining to private property.   But this has never been claimed or exercised independently of license from the royal government.   General usage in New Jersey, then, is decidedly hostile to this extraordinary claim of the proprietors.

A question has arisen whether the King of England can grant the soil of the sea and its arms, so as to destroy or prejudice public rights.   Not considering this question at all material to the main argument, I have purposely kept it out.

If he had not such a power, however, it serves to strengthen the construction of the royal grant that he did not intend thus to convey the sea and its arms by this charter.   It has been shown that all the uses to which these public waters can be applied are public and common.

It is only when the waters are excluded from the soil by alluvion, wharfing out, &c., &c., that it becomes private; and then the whole character is changed.   Udall v. The Trustees of Brooklyn, 19 Johns. Rep. 175.

To grant the soil, so as to give an individual the right to take it after such a change, has been made a nice question; and it has

been stated that a grant to have this effect must be specially formed.    Harg. 18; 2 Anst. 604, 609.    But why need it be so specially formed; if the king can at once grant so as to vest in an individual the soil, and divested of all common use before the change takes place?.

Common of fishery is a right which may be specially pleaded, and cannot be traversed.  Richardson v. The Mayor of Orford, 2 H. Black. 182; S. C. 4 Term Rep. 437; Ward v. Creswell, Willes' Rep. 268.  A grant of soil cannot destroy the common right of fishery, Chit. Prerog. 142; 2 Bl. Com. 39.    The distinction drawn by Blackstone between free and several fisheries is not that the latter requires an ownership of the soil, but an exclusive fishery in a private river, granted by a private person.  See Chitty on Fisheries, 243—269.  Harg. p. 11, admits a common right of fishery cannot be destroyed.

The grants and pre-emptive rights spoken of in the books are claims by prescription, and grants of prescriptive rights, arising or presumed to have arisen prior to Magna Charta.  See also 5 Mod. 73; Siderfin, 148, 149; 16 Vin. Piscary, b. 1; Year Book, 8 ed. 4, 18; 7 East, 195; 1 Inst. Magna Charta, ch. 16, 23.

The grant of the river Thames opposite London, is founded on an ancient prescriptive grant. Shultze, 56.    No case can be shown of a grant since Magna Charta and its confirmation, not founded on an ancient prescriptive right.

The royal fisheries in the river Banne were special royalties. the ancient inheritance of the crown resting upon old charters, collected from the Pipe Rolls; the evidence of which as there adduced, would have been superfluous, if the king has the right and power over the navigable waters here contended for.

The only remaining question to be considered is the effect of the decisions of Mundy v. Arnold, 1 Halsted, 1; and 1 Penning. Rep. 391.

The first of these cases occupied the whole ground.    The suit was brought on a location made under the proprietors with a view to try the right.    In the other case the question came up incidentally.

The object of this suit unquestionably was, to review and overturn the decision of Mundy v. Arnold.

There is no pretence for alleging that any question under the
        2 K 2

Constitution of the United States arose in Mundy v. Arnold. The question was of unwritten local laws, resting on the construction of an ancient charter applicable to real property, and affected by the usages of the state.

The jurisdiction of this Court over cases where citizens of another state than the one in which the suit arises are concerned, rests upon the ground that the federal Courts, in applying the law, will be more free from any undue influence.

But it is state law they are to apply, not to review, alter, or remodel state law.

The jurisdiction of this Court is not controlling or reviewing. It is not, so far as respects the settling of state law, equal. It is subordinate. The federal Courts follow, and do not lead. Their jurisdiction is occasional. Perhaps not one part in ten thousand of the public waters in question, are under the jurisdiction of this Court at all.

The members of this Court cannot be expected to be acquainted with all those local usages and opinions which enter into and modify the laws of a state, especially its unwritten law. Hence this Court has decided that the state judiciary is presumed best to know its own law, and is the appropriate organ to expound and settle it. Elmendorf v. Taylor, 10 Wheat.; Bell v. Morrison, 1 Peters, 359, 360. Hence this Court follows and changes with the state law. Green v. Neal, 6 Peters, 301.

It is said the decision in Arnold v. Mundy was not carried up and decided in the Court of Appeals. The true point to be ascertained is whether that decision is state law; whether it has been so far adopted and acted upon as to form a part of its unwritten law.

There are two branches of unwritten law in relation to this subject.

1. Those old and well-established doctrines about which there can be no dispute, and which can never be modified or changed without legislative interference, such as the law of descents.

2. Adjudications upon cases constantly arising, attended with new combinations of circumstances. It is in reference to this second branch, that the rule applies. Under the maxim, stare decisis, these adjudications form part of the unwritten common law. But they may occasionally, when found not to work well, be

modified. This flexibility is made to harmonize with the stability resulting from the application of the above maxim.. · The power of reconsidering and new-modelling adjudications will be exercised with great delicacy and caution. Adjudications once deliberately made, are held as forming part of the settled law; notwithstanding this occasional interference with the rule. An occasional deviation does not impair the character of a fixed rule. When an adjudication is once deliberately made by a Court competent to settle the law, the power of disturbing or remodeling it does not belong to the tribunal of a foreign government.

If such a point came up in the Supreme Court of any other state upon the local law of New Jersey, and it might come up incidentally, such a decision as in Arnold v. Mundy would be implicitly followed. The Courts at Westminster Hall would implicitly follow it. This Court, under the decision of Green v. Neal, would implicitly follow it.

Is the Supreme Court of New Jersey competent to settle law; or must it be carried up to the Court of Appeals? The appeals to that Court are only occasional. There are no reports of their decisions. The decisions of the Supreme Court are all reported by law; and they have by force of law and usage, the authority of binding precedents in the state when not appealed from.

When cited in other cases, even in the Court of Appeals, they are respected as precedents and as state law; more especially when they have stood for years, and have become the basis of business transactions and of legislative action, as in the present case.

It is also objected, that there has been but one decision upon this point. One decision fully and thoroughly investigated may be more effective than half a dozen decisions slightly considered. This ought not to be made a question of arithmetic. There are seldom in any case fully discussed more than one decision, because a Court will not, unless in a very special case, hear a second argument in the same or in another cause on the same point. It may, in other cases, be incidentally alluded to, but this can add little weight to the force of the decision. If that is wanted, we have it in this case. The doctrine was incidentally passed upon in 1 Penning. Rep. 391. Tide-waters were there held by the Court, and admitted by all the counsel, to be public navigable rivers.

The oyster fishery there, was only deemed to be public and common on that account. It has nowhere been decided by this Court, that there must be more than one decision, or a decision of the Court of Appeals in those states where they have such Courts, in order to introduce a case into the settled law of the state; such a doctrine, if carried out, would unsettle a vast body of law, and would be productive of infinite mischief in those states where a branch of the legislative body forms an occasional Court of Appeal. Remarks made by the Court in the case before them, must be taken in reference to the circumstances. In a case where the decision was by the State Court of Appeals, it may be said to form a part of the settled law: so where there have been several decisions, as sometimes happens in will cases, they may be said to have the same effect; but it does not follow that one decision may not have the same effect. In 5 Peters, 151, and 6 Peters, 299, this Court followed a single decision of the State Courts. A contrary doctrine would lead to unfortunate conflicts between the state and federal judiciary. If this Court should attempt to overturn Arnold v. Mundy, it could not be binding upon the State Courts. There would then be only one decision here. And upon the principles already settled in this Court, they would be bound to respect and follow the decision of their own State Court in preference. If this Court should believe that the soil was in the plaintiff below, but there was a common right of fishery, for the reason above stated, the judgment should be in favour of the defendants below.

Mr. Ogden for the defendants in error.

There are two questions in this case: First, the extent of the grant of King Charles the Second: Second, The operation and effect of the surrender in 1702, to Queen Anne.

The question whether the country, now the United States, was acquired by discovery or conquest, is of no moment in this case.

The question what passed to the Duke of York, by the letters patent, properly divides itself into two portions. 1. What was the thing granted? 2. Had the king the power to make the grant as it is construed by the defendants in error.

The grant is of all the lands, soils, rivers, &c., and of all other regalities. "Soil" is the appropriate word to pass land under

water. It is not a general term, but an apt and proper one to pass soil under a river; and therefore when used, passes by the king's grant all that is the prerogative right of the king. It is to be holden by the Duke of York and his heirs, in fee-simple, in free and common soccage. Now, suppose the deed stopped here, would there be any doubt of its construction? It then grants the powers of government, civil and military.

By the grant to the Duke of York, King Charles the Second parted with all the premises included within the grant, and also with all his rights of sovereignty or power of government, on condition, and so long as the laws made by the new government were not contrary to the laws of England; reserving only a right of receiving and hearing appeals from provincial judgments and decrees or sentences. He parted with all his prerogative rights in the territory contained in the grant: because having parted with the sovereign power, he must necessarily have parted with all the rights of sovereignty. He parted with his crown and with all the rights attached to it; and he had no prerogative rights remaining in him, except those expressly reserved.

The Duke of York, and the proprietors of New Jersey under him, were seised and possessed of all the rights of the King of England, both of property and government.

This presents the point, had the king power to make such a grant?

It seems to the counsel for the defendants in error, to be placing this question on too narrow a ground, to put the validity of this grant, upon the king's prerogative rights. Those rights were, from their nature, and must be confined to England.

This grant, parting not only with the soil, but with the government of the country granted by him, transcends all his prerogative rights under the common law of England. He, as king, cannot grant a right of sovereignty over any part of England. This right to part with and convey the property and sovereignty of government of this territory, must be traced to the great principles of national law; applicable to every nation, to every sovereign in whom is the power of disposing of any property which the nation has acquired either by conquest or discovery. The correctness of this view of sovereign power, must be judged of, not by the common law, but according to the law of nations.

It is considered a cession by a sovereign to one of his subjects, but it is intended to vest in that subject a territory with all the rights of government; and it must be construed as if it were a cession to another sovereign. By the treaty of 1783, the King of Great Britain ceded all his right and sovereignty over the United States. Did not the rivers and the soil under them pass without apt and special words to include all his regalities?

This was a newly acquired territory, then a wilderness; the settlement and improvement of it were great objects with the crown. In order to effect this, it was intended to hold out great inducements to Englishmen and others to come over and inhabit it. Self-government was always a favourite object with the people of England, who were strongly imbued with a love of liberty; and in furtherance of that object, this grant, and the power and property included in it, were made and granted by the king. The people were to be subject to their allegiance to the crown; but not to be subject to all the prerogatives vested in the king by the common law.

To a certain extent, this was a part of one and the same nation. The enemies of England, in time of war, were their enemies; and in time of peace, they were at peace with every nation with whom England was at peace. But to a great extent they were an independent government; making their own laws, holding treaties with the Indians, naturalizing citizens, and exercising full legislative authority; restrained only by the condition contained in the patent, with an exclusive power of taxing their inhabitants, &c.

To assert that they held all their rights, and exercised all their power subject to the common law prerogative of the King of England, would be contrary to common sense. To one prerogative, from their peculiar and anomalous situation, they were subject, the power of the king to declare war and to make peace; but to nothing else.

The exercise of the royal prerogative had in many cases been considered as leading to acts of tyranny in England; and to avoid being no longer within it, was no doubt one great inducement to many to leave that kingdom; and they never could believe that those prerogative rights were to follow them in their new homes.

In connection with this point in the argument, it is important to refer to dates

: The patent of Charles the Second to the Duke of York was dated on the 12th of March, 1664. The duke conveyed to Berkley and Carteret on the 24th June, 1664. The concession and agreement made by Berkley and Carteret with all and every the adventurers, and all such, as shall settle or plant there, bears date the 10th February, 1664.

If this was before the grant to the Duke of York, it is probable the concessions were known and approved of by the king before he made the grant to the duke. Whether, therefore, these grants, concessions, and agreements of Berkley and Carteret were made after or before the letters patent, is of no consequence.

By the twenty-fifth article of the concessions we find the proprietors acting and erecting a government of their own, with the knowledge and consent of the king, with three distinct departments, legislative, executive, and judicial; and free, it is apprehended, from all the common law prerogatives of the crown of England, and subject only to one great prerogative, that of making war and peace.

. In confirmation of this doctrine, the Court are referred to Salkeld, 666, where Lord Holt says, "The law of England does not extend to Virginia; her law is what the king pleases." In the opinion of Lord Holt, the power of the king was unlimited; restrained, or governed by no principle of the common law. He had a right, then, to grant New Jersey without any reference to the laws of England, or to his prerogatives under those laws. He could give no stronger evidence of his pleasure than by the words of the grant made by him to the Duke of York.

But if this case is to be determined according to the strictest and most technical rules of the common law, let us now examine that law, and see what will be the result upon the questions in this case.

It is contended by the counsel for the plaintiffs in error, that the prerogative rights of the king to rivers, in which the tide ebbs and flows, to the bays and inlets from the sea, to the soil under the rivers, and to the fisheries, are held by him in trust for the use of all his subjects; and cannot be transferred by him to an indi-

vidual. If these were the trusts upon which the king held these rights, it is presumed that the state of New Jersey must now hold them upon the same trusts. By the Revolution, the state acquired all the rights which belonged to the crown, but none others. If the king held all the rights upon the trusts mentioned, the state must hold them upon the same trusts.

But by the legislation of New Jersey, all such trusts are denied. Acts of the legislature of New Jersey of November 24, and December 27, 1818. These acts authorize the leasing of those flats, or land, or soil under the water to any individual, and not to the riparian owners of the soil only, but to any one who shall pay the state a certain annual rent; and have actually leased to the plaintiffs in error the premises in dispute for a term of years, none of whom are stated to be the owners of the adjacent shores.

If the legislature of New Jersey have the power to lease for years, they may do so for life or in fee. So long as they have the power to convey any interest or estate in the premises to individuals, the nature and continuance of the estate to be conveyed or granted must depend entirely and exclusively on the legislative discretion.

By what course of reasoning do the counsel for the plaintiffs in error arrive at the conclusion that the state have now the power to made a disposition of this property for private purposes, and that the crown anterior to the Revolution had no such power or right.

It is not intended to consume the time of the Court by reading the cases referred to in the argument already addressed to the Court by the counsel for the defendants in error. The principles contained in these authorities will be stated. All rivers, bays which are what are called arms of the sea, in which the tide ebbs and flows, and the soil under them below high-water mark, and the rights of fisheries in these rivers, primâ facie belong to the king. They may, however, belong to a subject; but he must show his title to them. He may show, either an actual grant, or he may show a title by prescription, which always supposes a grant.

A grant from the king of a river, and the soil under it, passes a right of fishery to the grantee. It was, for some time, made a

question, whether there could be a several right of fishery with-out the ownership of the soil; all the cases on that subject neces-sarily admit that the right of soil under the river may be vested in an individual. There are but two cases from which a contrary doctrine can be deduced. They are the cases in 6 Modern, 73, and 5 Rob. Adm. Rep. 159. But this Court, it is confidently be-lieved, will not suffer these two cases to overrule the mass of authorities cited for the defendants in error, nor the authority of Sir Mathew Hale, one of the most learned and accurate lawyers that ever lived.

To proceed to the second point; what rights were surrendered by the proprietors to the crown, by the deed of surrender of 1702?

It will be recollected that the original grant from Charles the Second was not only of the property, but of the government of the territories granted. All civil and military power was granted.

In 1702, the proprietors surrendered their right of government, and nothing else; whatever was a right of property was retained by them. Whatever was necessary for the government, was surrendered by them.

Certainly the surrender never intended to abandon any of the property, and to enable the queen to grant it. It has been shown that the property in the soil was granted to those who held under the letters patent of Charles the Second, as property. It is, then, evident that it never was surrendered to the crown. If it never was granted as property, but was a part of the powers of govern-ment necessarily appertaining to it, then it was not surrendered. As has been shown by the cases cited, the soil under a river may be granted by the crown to a subject, and the government still goes on. This fully establishes the position that the retaining such property in the crown is not necessary to the existence and administration of the government.

The proprietors exercised privileges which are essential to every government. They established forts. A fort was erected at Amboy. They continued after the surrender to use and ex-ercise all rights of property in the territory for its protection and for their advantage. This is not a case of local law, and the de-cisions of the Courts of New Jersey are not entitled to authority

in the Courts of the United States, as they would be on the construction of the statutes of New Jersey. This Court will look at these decisions with respect, but will not yield to them the decision of the question before the Court. The Court are now called upon to give a construction to a patent from the King of England, which related to territory as well within the limits of what is now New York, as New Jersey. This is not a local question.

For the construction the Court are now called upon to give to these letters patent, they will look at the interpretation given to them in West Jersey. The people of that part of the territory granted by the letters patent, have always used the right of fishery in the river Delaware. This right has been derived from grants of the proprietors of West Jersey.

Mr. Wright, for the defendants in error.

The following is a concise statement of the facts of the case. An action of ejectment was instituted in the Circuit Court of the United States for the district of New Jersey, by the defendant in error, to try the title to land covered with water, situated in the bay of Amboy near the mouth of the Raritan river. The defendant in error, being plaintiff below, obtained a judgment in the Circuit Court, on a special verdict; and this writ of error was prosecuted by the defendants.

In the Circuit Court, the plaintiffs in the ejectment claimed title under a patent from King Charles the Second of England, to his brother James, then Duke of York, executed 12th March, 1664; by which the whole of the territory now the state of New Jersey, including the premises in question, with other large bodies of land, were granted to the Duke of York. By conveyances from the Duke of York and others, the property was claimed to be vested in the defendant in error. The patent describes the land in the usual form of such conveyances from the crown of England, without any exceptions or reservations, with certain islands upon the sea coast, "and the lands from the west side of Connecticut river to the east side of the Delaware bay."

This was the grant of property from the king to the duke, and it is not questioned that the mesne conveyances from the duke down to the plaintiff in the ejectment have been equally broad and comprehensive to carry the title to the premises in question. In a

[Martin et al. v. Waddell.]

subsequent part of the patent, full powers of government, civil and military, in and over the territory, are granted to the duke, " his heirs, deputies, agents, and assigns," reserving only an appeal to the king in favour of any person "touching any judgment or sentence to be by them made or given."

On the 15th of April, 1702, the twenty-four proprietors of East New Jersey, "assignees of the Duke of York," surrendered to Anne, then Queen of England, the powers of government granted in the patent from the king, which surrender was made in the very terms of the grant, in the patent; and that surrender so made, was accepted by the queen two days after it was made.

Under this state of facts, not controverted, the questions in this case are made: ·

First, Could the King of England, in conformity with the law of nations and the laws of England, convey, in the year 1664, to a subject of his realm a valid title to lands covered by the water of bays, rivers, or arms of the sea, where the tide ebbs and flows, in the province of New Jersey?

The laws of nature and nations establish the following propositions, pertinent to this question:

1. Every nation is the proprietor as well of the rivers and seas as of the lands within its territorial limits. Vattel's Law of Nations, 120, sec. 266.

2. The sea itself, to a certain extent, and for certain purposes, may be appropriated and become exclusive property as well as the land. Vattel, 127, sect. 287; Rutherford, book 1, ch. 5, p. 76, sect. 3.

3. The nation may dispose of the property in its possession, as it pleases; may lawfully alienate or mortgage it. Vattel, 117, sect. 261, 262.

4. The nation may invest the sovereign with the title to its property, and thus confer upon him the rights to alienate or mortgage it. Vattel, 117, sect. 261, 262.

The laws of England establish the following propositions material to this point: First, the common law of England vests in the king the title to all public property. 1 Black. Com. ch. 8, 298, 299; 2 Black. Com. 15, 261, 262; Hargrave's Law Tracts, de Jure Maris, ch. 4, 10, 11, 12; 6 Com. Dig., title Prerogative,

60; b, 63, Tenure, 337; 5 Com. Dig., title Navigation, 107; 3 Coke's Reports, 5, 109.

2. A subject may acquire the property of navigable rivers and the soil, and of specific localities in the sea itself, by grant or prescription, as he may many other prerogative rights of the king of a like character; and the king may make all these grants to a subject. Hargrave's Law Tracts, de Jure Maris, ch. 4, 11, 13, ch. 5, 17, 18; Palmer v. Mulligan, 3 Caines's Rep. 315, 319; The People v. Platt, 17 Johns. Rep. 195.

The Massachusetts cases equally recognise the authority of the law tracts in that state. So, too, are the decisions in other states. 1 Pick. Rep. 180.; 2 Conn. Rep. 481; 2 Binney's Rep. 475.

As it has been said that no grants of navigable rivers, and the soils and fisheries thereof, have been made since Magna Charta, the following references are made. Darr. Rep. 155; Donegal v. Hamilton, 3 Ridgeway's Parliamentary Cases, 276—328.

Other authorities of English elementary authors, and English adjudged cases, sustain Lord Hale in the positions that the subject can acquire these rights, and that the king has a right to make the grants, and has been accustomed to make them. 1 Black. Com. 286; 5 Cruise's Dig. 45, sec. 10, tit. 54, King's Grant; 3 Cruise's Dig. 262; Carter v. Murcat, 4 Burr. Rep. 2163; S. C. 2164, 2165, 1 Mod. Rep. 105; 5 Com. Dig. 108, tit. Navigation, 6 Com. Dig. 55, tit. Prerogative; 4 Coke's Rep. part 7, p. 19; Ballbrook v. Gooden, 2 Burr. 1768. All the following authorities of a date later than the publication of Hargrave's Tracts give to them the highest authority. The Banker's Case, Skinner's Rep. 601; The Mayer of Oxford v. Richardson, 4 Dumford and East, 439; 5 Burr. 285; 5 Modern, 556; 3 Barnwell and Cresswell, 875; 2 Bos. and Pull. 472; 5 Barnwell and Cresswell, 268. American cases sustain the right of the king to make such grants. 2 Binney's Rep. 476; 4 Mass. Rep. 144; 522; 1 Pick. 180; 3 Johns. Rep. 357, 6 Johns. 131; 17 Johns. 195; 20 Johns. 90.; 1 Conn. Rep. 284; 7 Conn. Rep. 486; 2 Conn. Rep. 481; 1 Har. and M'Hen. Rep. 564; 8 Wheat. 577—597.

Mr. Wright proceeded to examine the cases cited for the plaintiffs in error in support of the principles contended for by them. He argued that none of those cases impugned the doctrine he had claimed. Some of the cases were taken from the civil, and not

from the common law, to which only the parties must look for the principles to govern the controversy. The difference between the civil and common law rights, and between the common law and the civil law, are laid down by Bracton. Barnwell and Cresswell, 290, 292, 293, 309, 311.

Blackstone (2 Black. Com. 39) supposes that Magna Charta, ch. 16, had restrained the king from granting free fishery; by which he evidently intends "exclusive fishery, in navigable waters, when the soil is in the king;" but he says it is different as to several fishery, because that must either be in, or be derived from, the owner of the soil.

The Kings of England, then, had the right, by the laws of nations and the laws of England, at least until the statute of 1 Anne, in the year 1701, to grant in fee, to a subject, the crown lands and various royal franchises, portions of the property and inheritance of the crown, within the realm; and the subject could take, hold, possess, and enjoy, in full propriety, according to the grant, the lands and franchises so conveyed to him by the sovereign.

It cannot surely be necessary to resort to argument or authority to prove that the power of the king to make grants to his subjects, either of lands or franchises, in the waste and wilderness province of New Jersey, in 1664 or 1674, was at least as extensive as the power he then possessed to make similar grants within the realm of England.

Still it has been objected that the title of the defendant in error is not sustained by these authorities, and the principles they establish; because it is said the power of the king to grant is confined to the alienation of his private property, "his ordinary revenue," "lands vested in him upon feudal principles," and does not extend to the public property, to property held "by virtue of his prerogative," in which way only it is alleged he holds "the allodium of the soil of navigable rivers and the sea." The authorities already cited answer this objection.

All the cases establish the power of the king to make the grant, or the right of the subject to hold by prescription, which presupposes a grant from the crown as the only lawful commencement of the title. Cited, 3 Cruise's Dig. 244, tit. Franchise, sec. 1; 5 Cruise, 46, tit. King's Grant, sec. 7; 2 Black. Com. 265; 4 Burr. Rep. 2165.

This objection, however, has no foundation in the English common law, but is entirely subversive of one of its oldest and best settled principles.    The king holds nothing as " private property," but every thing in jure coronæ.   Even that which was his private property before he was king, the moment the crown descends upon him, is held jure coronæ, and not as his private property.   6 Comyn's Dig. 60, tit. Prerogative, (D. 64); Skinner's Rep. 603.

A second objection is, that by chapters 16 and 23 of the statute of Magna Charta, adopted by the king and parliament of England in the ninth year of the reign of Henry the Third, A. D. 1224–5, the power of the king to grant the soil of navigable rivers, ports, havens, and arms of the sea, was restrained, and the exercise of it as to new grants entirely prohibited, so that any such grants, made subsequent to that statute, are contrary to its provisions, and therefore void.

This objection admits of several very conclusive answers; but the one which seems to present itself as first in order, as if sound it must be in importance, is

1. That neither of these chapters of Magna Charta relate, at all, to the title of the soil upon which they act, or contain any prohibition whatever against grants of soil anywhere, either by the sovereign, or a subject.   They merely in the broadest construction which any one has sought to give to them, prescribe and restrain the use of the soil of the banks and beds of rivers, as it relates to obstructions to navigation and fishing; and that equally whether the propriety of that soil be in a subject, or in the king.

This position will not be obviated, if the Court shall be of the opinion that, by virtue of these statutes, a common right of fishery in the waters which cover the premises in question was secured to all the subjects of the king, and has passed to the people of the state of New Jersey; because the plaintiffs in error do not defend under any such claim of common right, but under a title in the state of New Jersey, adverse to the title of the defendant in error, and by virtue of which they claim a several fishery, the right to put the waters and banks in defence, to put down wears thereon, not obstructing the navigation, and to exclude, for

a term of years, all the other inhabitants of New Jersey from taking fish there.

2. Another answer to this objection is, that Magna Charta is a mere statute, and its application was local and confined to the realm of England, for which the Parliament which passed it was the local legislature, unless subsequently expressly extended to the colonies by competent authority.

1. This is shown upon the face of the statute itself. The preamble contains this language. Cited Coke's Institutes, part 1, vol. 1, p. 1, English ed. 1817.

In order further to show the proper construction of the sixteenth chapter of Magna Charta, Mr. Wright also cited 2 Black. Com. 39; Cruise's Digest, 261, title Franchise; Duke of Somersett *v.* Fogwell, 2 Barn. & Cress. 875; 1 Statutes of Great Britain and Ireland, 579, 718, vol. 2, 213, 242, 644, 688; 7 Coke's Rep. part 13, p. 35, 36.

It is believed that both the objections above enumerated are effectually disposed of by the considerations and authorities presented, and that the proposition before arrived at is fully established, viz.: "That the King of England had the right, by the laws of nations, and the laws of England, at least until the statute of 1 Anne, in the year 1701, to grant in fee, to a subject, the crown lands, and various royal franchises, portions of the property and inheritance of the crown, within the realm; and the subject could take, hold, possess, and enjoy in full propriety, according to the grant, the lands and franchises, so conveyed to him by the sovereign."

This Court has adopted these principles, as to the power of the king over his distant and conquered dominions; and has applied them to the American colonies, especially so far as they relate to grants of the soil of this country, in a great variety of decisions. One of the leading cases, if not the most so, is that of Johnson *v.* M'Intosh, in which the opinion of the Court was pronounced by the late Chief Justice Marshall. Johnson *v.* M'Intosh, 8 Wheat. Rep. 543, 573, 574, 595, 597.

Whatever then may have been, or may be the power of the King of England to grant lands within the realm, it is believed the main question with which this argument commenced may now be safely answered. That the King of England, in conformity

with the laws of nations and the laws of England, could convey, in the year 1664, to a subject of his realm, a valid title to lands covered by the water of bays, rivers, and arms of the sea, where the tide ebbs and flows, in the then province of New Jersey; and that the Courts of the United States cannot, according to the well-established principles of the laws of nations, of the laws of England, and of the laws of the United States, as applicable to grants of land within the United States, pronounce such a conveyance void, for the want of constitutional and legal power in the king to make the grant.

Second, The next question is, do the letters patent from the king to the Duke of York, found in the special verdict, in fact convey the premises claimed by the defendant in error; and to recover which this action is brought.

This inquiry must be answered principally from the letters patent themselves; and in them are found the following grants,

Mr. Wright read the charter from King Charles the Second to the Duke of York, as set forth in the special verdict: and cited on the construction of the charter, 2 Black. Com. 347, 348, 346; 7 Connecticut Rep. 186; Palmer v. Hicks, 6 Johns. Rep. 133; 7 Connecticut Rep. 199, 200.

These letters patent, then, do convey to the Duke of York the premises in question in this suit, so far as the propriety thereof was vested in the king at the time of the grant. Under these letters patent, the Duke of York took and held the territory described and conveyed unto him in the same year, when he assigned and transferred the same to Lord Berkley and Cartaret. They thus became the owners of the property and government, and exercised all their rights in the same. Mr. Wright then referred to the grants to the purchasers from Lord Berkley and Cartaret, as stated by the jury, and to the proceedings of the twenty-four proprietors of East Jersey, after they became the owners of the territory and government. He cited Leaming and Spicer, 153, 77, 138, 227, 362.

Third, Did this surrender to the Queen of England include, and carry with it, a surrender by the proprietors who made it, of the propriety of the soil covered by the waters of the navigable rivers, bays, ports, havens, and arms of the sea, within the terri-

tory granted to them under the letters patent from King Charles the Second?

1. Does the deed of surrender, upon its face, reconvey the title to, and property in that part of the territory of New Jersey in which the premises are situated? By a reference to the charter, it will be seen that the powers of government were granted by a different instrument from that of the grants of the soil and the appurtenances to it. The two classes of grants are in nowise connected. Leaming and Spicer, 609 to 615.

No construction of the language employed in these patents can be adopted, which by fair legal interpretation can be made to amount to a conveyance of a single item of the property granted in the first letters patent.

It is denied that the grantors in the deed of surrender intended to surrender and reconvey to the crown, any of the rights of soil or of property conveyed to them by the letters patent of King Charles the Second. This is shown by the terms of the surrender. Leaming and Spicer, 613, 588, 589, 590, 593, 594, 596, 619.

The residue of the argument of Mr. Wright was, upon questions arising on the charter and surrender, on which no opinion was given by the Court; and this part of the argument is, therefore, omitted. The opinion of the Court was upon the power of the king to grant the soil as claimed under the charter, by the defendant in error, holding under the twenty-four proprietors of East Jersey, as the grantees under the Duke of York.

The last question for consideration is on the effect of the decision of the Supreme Court of New Jersey, in the case of Arnold *v.* Mundy, reported in 1 Halsted's Reports, 1. Does that decision bind this Court in the present case?

The principal cases in which this question has been raised and considered or decided in this Court, are the following: M'Kean *v.* Delancy, 5 Cranch, 82; Polk *v.* Wendal, 9 Cranch, 87; Thatcher *v.* Powell, 6 Wheat. 119; Blight *v.* Rochester, 7 Wheat. 535; Daly *v.* James, 8 Wheat. 495; Elmendorf *v.* Taylor, 10 Wheat. 152; 11 Wheat. 361; 12 Wheat. 153; 1 Peters, 571.

The principles deducible from these decisions, and which are to govern the application of the rule, would seem to be the following:

1. That the point presented to this Court, and upon which its decision is invoked, shall be identical in substance and in law with the point presented to, and decided by the State Courts, whose decisions are relied upon as being the guide to this Court.

2. The point must arise upon the construction of a legislative act of the state, whose Courts have given the construction relied upon; or as to what is the local law of that state, relating to the title to real property in the given case.

3. The decision of the State Court upon the point presented, must have remained so long, and have been so uniform as to authorize the presumption of acquiescence on the part of the people and authorities of the state, and to have made the decisions of these Courts upon that point a settled and established rule of law, as to titles to lands within the state.

Mr. Wright then went into a particular examination of the case of Arnold. *v.* Mundy, and contended that the decision did not come, in any manner, within the principles he had stated, and which are sustained by the cases referred to. In this examination he cited Hargrave's Law Tracts, de Jure Maris, ch. 1, p. 5; 1 Mod. 105.

Upon this point, after the examination of the case, he said:

For each and all of these reasons, the decision of the Supreme Court of New Jersey in the case of Arnold *v.* Mundy, cannot be considered as establishing a rule of law as to real property in that state, binding upon this Court in the decision of this cause. Wilkinson *v.* Leland et al., 2 Peters, 656; Hind and wife *v.* Vattier, 5 Peters, 401. After the analysis of the report of that case, which has been before made, it is believed that this Court will follow the rule laid down in these two cases, and say that the Circuit Court of New Jersey, in the case in question, was bound to decide, as the State Courts ought to have decided the same great questions, when presented to them for decision. In that case, the rules of the English common law, and not those of the civil law, will be the guide to a decision here.

Mr. Chief Justice TANEY delivered the opinion of the Court.

This case is brought here by writ of error from the Circuit Court of the United States, for the district of New Jersey. It was fully argued at the last term. But it was not then decided,

[Martin et al. v. Waddell.]

because the important principles involved in it, made it proper that the case should be heard and determined by a full Court; and as some of the justices were not present at the former hearing, a re-argument was ordered. In pursuance of this order, it has been again elaborately discussed by counsel; and having been carefully considered by the Court, I am instructed to deliver their opinion.

The questions before us arise upon an action of ejectment, instituted by the defendant in error, who was the plaintiff in the Court below, to recover one hundred acres of land, covered with water, situated in the township of Perth Amboy, in the state of New Jersey. At the trial in the Circuit Court, the jury found a special verdict, setting forth, among other things, that the land claimed lies beneath the navigable waters of the Raritan river and bay, where the tide ebbs and flows. And it appears that the principal matter in dispute, is the right to the oyster fishery in the public rivers and bays of East New Jersey.

The plaintiff makes title under the charters granted by Charles the Second to his brother the Duke of York, in 1664 and 1674, for the purpose of enabling him to plant a colony on this continent. The last-mentioned grant is precisely similar to the former in every respect, and was made for the purpose of removing doubts which had then arisen as to the validity of the first.

The boundaries in the two charters are the same, and they embrace the territory which now forms the state of New Jersey. The part of this territory known as East New Jersey, afterwards, by sundry deeds and conveyances, which it is not necessary to enumerate, was transferred to twenty-four persons, who were called the proprietors of East New Jersey; who by the terms of the grants were invested, within the portion of the territory conveyed to them, with all the rights of property and government which had been originally conferred on the Duke of York by the letters patent of the king. Some serious difficulties, however, took place in a short time between these proprietors and the British authorities; and after some negotiations upon the subject, they, in 1702, surrendered to the crown all the powers of government, retaining their rights of private property.

The defendant in error claims the land covered with water, mentioned in the declaration, by virtue of a survey made in 1834,

under the authority of the proprietors, and duly recorded in the proper office. And, if they were authorized to make this grant, he is entitled to the premises as owner of the soil, and has an exclusive right to the fishery in question. The plaintiff in error also claims an exclusive right to take oysters in the same place; and derives his title under a law of the state of New Jersey, passed in 1824, and a supplement thereto, passed in the same year.

The point in dispute between the parties, therefore, depends upon the construction and legal effect of the letters patent to the Duke of York, and of the deed of surrender subsequently made by the proprietors.

The letters patent to the duke included a very large territory, extending along the Atlantic coast from the river St. Croix to the Delaware bay, and containing within it many navigable rivers, bays, and arms of the sea; and after granting the tract of country and islands therein described, "together with all the lands, islands, soils, rivers, harbours, mines, minerals, quarries, woods, marshes, waters, lakes, fishings, hawkings, huntings, and fowlings, and all other royalties, profits, commodities, and hereditaments to the said several islands, lands, and premises belonging and appertaining with their and every of their appurtenances, and all the estate, right, title, interest, benefit, and advantage, claim, and demand of the king, in the said land and premises;" the letters patent proceed to confer upon him, his heirs, deputies, agents, commissioners, and assigns, the powers of government with a proviso that the statutes, ordinances, and proceedings, established by his authority should "not be contrary to, but as nearly as might be, agreeable to the laws, statutes, and government of the realm of England; saving also an appeal to the king, in all cases, from any judgment or sentence which might be given in the colony, and authorizing the duke, his heirs and assigns, to lead and transport out of any of the realms of the king to the country granted, all such and so many of his subjects or strangers not prohibited, or under restraint, who would become the 'loving subjects' of the king, and live under his allegiance, and who should willingly accompany the duke, his heirs and assigns."

The right of the king to make this grant, with all of its prerogatives and powers of government, cannot at this day be ques-

[Martin et al. *v.* Waddell.]

tioned.   But in order to enable us to determine the nature and extent of the interest which it conveyed to the duke, it is proper to inquire into the character of the right claimed by the British crown in the country discovered by its subjects, on this continent; and the principles upon which it was parcelled out and granted.

The English possessions in America were not claimed by right of conquest but by right of discovery.   For according to the principles of international law, as then understood by the civilized powers of Europe, the Indian tribes in the new world were regarded as mere temporary occupants of the soil, and the absolute rights of property and dominion were held to belong to the European nation by which any particular portion of the country was first discovered.   Whatever forbearance may have been sometimes practised towards the unfortunate aborigines, either from humanity or policy, yet the territory they occupied was disposed of by the governments of Europe at their pleasure, as if it had been found without inhabitants.   The grant to the Duke of York, therefore, was not of lands won by the sword; nor were the government or laws he was authorized to establish intended for a conquered people.

The country mentioned in the letters patent, was held by the king in his public and regal character as the representative of the nation, and in trust for them.   The discoveries made by persons acting under the authority of the government were for the benefit of the nation; and the crown, according to the principles of the British constitution, was the proper organ to dispose of the public domains; and upon these principles rest the various charters and grants of territory made on this continent.   The doctrine upon this subject is clearly stated in the case of Johnson *v.* M Intosh, 8 Wheat. 595.   In that case the Court, after stating it to be a principle of universal law that an uninhabited country, if discovered by a number of individuals who owe no allegiance to any government, becomes the property of the discoverers, proceed to say that, " If the discovery be made and possession taken under the authority of an existing government which is acknowledged by the emigrants, it is supposed to be equally well settled that the discovery is made for the benefit of the whole nation; and the vacant soil is to be disposed of by that organ of the government which has the constitutional power to dispose of the

national dominions; by that organ, in which all territory is vested by law.  According to the theory of the British constitution, all vacant lands are vested in the crown as representing the nation, and the exclusive power to grant them is admitted to reside in the crown, as a branch of the royal prerogative.  It has been already shown that this principle was as fully recognised in America as in the island of Great Britain."

This being the principle upon which the charter in question was founded, by what rules ought it to be construed?

We do not propose to meddle with the point which was very much discussed at the bar, as to the power of the king since Magna Charta to grant to a subject a portion of the soil covered by the navigable waters of the kingdom, so as to give him an immediate and exclusive right of fishery either for shell fish or floating fish within the limits of his grant.  The question is not free from doubt, and the authorities referred to in the English books cannot perhaps be altogether reconciled.  But from the opinions expressed by the justices of the Court of King's Bench, in the case of Blundall v. Catterall, 5 Barn. and Ald. 287, 294, 304, 309; and in the case of The Duke of Somersett v. Fogwell, 5 Barn. and Cress. 883, 884, the question must be regarded as settled in England against the right of the king since Magna Charta to make such a grant.  The point does not, however, arise in this case unless it shall first be decided that in the grant to the Duke of York the king intended to sever the bottoms of the navigable waters from the prerogative powers of government conferred by the same charter; and to convert them into mere franchises in the hands of a subject, to be held and used as his private property.  And we the more willingly forbear to express an opinion on this subject, because it has ceased to be a matter of much interest in the United States.  For when the Revolution took place, the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government.  A grant made by their authority must therefore manifestly be tried and determined by different principles from those which apply to grants of the British crown,

when the title is held by a single individual in trust for the whole nation.

Neither is it necessary to examine the many cases which have been cited in the argument on both sides, to show the degree of strictness with which grants of the king are to be construed. The decisions and authorities referred to apply more properly to a grant of some prerogative right to an individual to be held by him as a franchise, and which is intended to become private property in his hands. The dominion and property in navigable waters, and in the lands under them, being held by the king as a public trust, the grant to an individual of an exclusive fishery in any portion of it, is so much taken from the common fund intrusted to his care for the common benefit. In such cases, whatever does not pass by the grant, still remains in the crown for the benefit and advantage of the whole community. Grants of that description are therefore construed strictly—and it will not be presumed that he intended to part from any portion of the public domain, unless clear and especial words are used to denote it. But in the case before us, the rivers, bays, and arms of the sea, and all prerogative rights within the limits of the charter, undoubtedly passed to the Duke of York, and were intended to pass, except those saved in the letters patent. The words used evidently show this intention; and there is no room, therefore, for the application of the rule above mentioned.

The questions upon this charter are very different ones. They are: Whether the dominion and propriety in the navigable waters, and in the soils under them, passed as a part of the prerogative rights annexed to the political powers conferred on the duke? Whether in his hands they were intended to be a trust for the common use of the new community about to be established; or private property to be parcelled out and sold to individuals, for his own benefit. And in deciding a question like this, we must not look merely to the strict technical meaning of the words of the letters patent. The laws and institutions of England, the history of the times, the object of the charter, the contemporaneous construction given to it, and the usages under it, for the century and more which has since elapsed, are all entitled to consideration and weight. It is not a deed conveying private property to be interpreted by the rules applicable to cases of that description.

It was an instrument upon which was to be founded the institutions of a great political community; and in that light it should be regarded and construed.

Taking this rule for our guide, we can entertain no doubt as to the true construction of these letters patent. The object in view appears upon the face of them. They were made for the purpose of enabling the Duke of York to establish a colony upon the newly discovered continent, to be governed, as nearly as circumstances would permit, according to the laws and usages of England; and in which the duke, his heirs and assigns, were to stand in the place of the king, and administer the government according to the principles of the British constitution. And the people who were to plant this colony, and to form the political body over which he was to rule, were subjects of Great Britain, accustomed to be governed according to its usages and laws.

It is said by Hale in his Treatise de Jure Maris, Harg. Law Tracts, 11, when speaking of the navigable waters, and the sea on the coasts within the jurisdiction of the British crown, "that although the king is the owner of this great coast, and, as a consequent of his propriety, hath the primary right of fishing in the sea and creeks, and arms thereof, yet the common people of England have regularly a liberty of fishing in the sea, or creeks, or arms thereof, as a public common of piscary, and may not, without injury to their right, be restrained of it, unless in such places, creeks, or navigable rivers, where either the king or some particular subject hath gained a propriety exclusive of that common liberty."

The principle here stated by Hale, as to "the public common of piscary" belonging to the common people of England, is not questioned by any English writer upon that subject. The point upon which different opinions have been expressed, is whether since Magna Charta, "either the king or any particular subject can gain a propriety exclusive of the common liberty." For, undoubtedly rights of fishery, exclusive of the common liberty, are at this day held and enjoyed by private individuals under ancient grants. But the existence of a doubt as to the right of the king to make such a grant after Magna Charta, would of itself show how fixed has been the policy of that government on this subject for the last six hundred years; and how carefully it

has preserved this common right for the benefit of the public. And there is nothing in the charter before us indicating that a different and opposite line of policy was designed to be adopted in that colony. On the contrary, after enumerating in the clause herein before quoted, some of the prerogative rights annexed to the crown, but not all of them, general words are used, conveying "all the estate, right, title, interest, benefit, advantage, claim, and demand" of the king in the lands and premises before granted. The estate and rights of the king passed to the duke in the same condition in which they had been held by the crown, and upon the same trusts. Whatever was held by the king as a prerogative right, passed to the duke in the same character. And if the word "soils" be an appropriate word to pass lands covered with navigable water, as contended for on the part of the defendant in error, it is associated in the letters patent with "other royalties," and conveyed as such. No words are used for the purpose of separating them from the jura regalia, and converting them into private property, to be held and enjoyed by the duke, apart from and independent of the political character with which he was clothed by the same instrument. Upon a different construction, it would have been impossible for him to have complied with the conditions of the grant. For it was expressly enjoined upon him, as a duty in the government he was about to establish, to make it as near as might be agreeable in their new circumstances, to the laws and statutes of England; and how could this be done if in the charter itself, this high prerogative trust was severed from the regal authority? If the shores, and rivers, and bays, and arms of the sea, and the land under them, instead of being held as a public trust for the benefit of the whole community, to be freely used by all for navigation and fishery, as well for shell-fish as floating fish, had been converted by the charter itself into private property, to be parcelled out and sold by the duke for his own individual emolument? There is nothing we think in the terms of the letters patent, or in the purposes for which it was granted, that would justify this construction. And in the judgment of the Court, the land under the navigable waters passed to the grantee as one of the royalties incident to the powers of government; and were to be held by him in the same manner, and for the same purposes that the navigable

2 M 2

waters of England, and the soils under them, are held by the crown.

This opinion is confirmed by referring to similar grants for other tracts of country upon this continent, made about the same period of time. Various other charters for large territories on the Atlantic coast, were granted by different monarchs of the Stuart dynasty to different persons, for the purposes of settlement and colonization, in which the powers of government were united with the grant of territory. Some of these charters very nearly resembled in every respect the one now in controversy; and none of them, it is believed, differed materially from it in the terms in which the bays, rivers, and arms of the sea, and the soils under them, were conveyed to the grantees. Yet, in no one of these colonies has the soil under its navigable waters, and the rights of fishery for shell-fish or floating fish, been severed by the letters patent from the powers of government. In all of them, from the time of the settlement to the present day, the previous habits and usages of the colonists have been respected, and they have been accustomed to enjoy in common, the benefits and advantages of the navigable waters for the same purposes, and to the same extent, that they have been used and enjoyed for centuries in England. Indeed, it could not well have been otherwise; for the men who first formed the English settlements, could not have been expected to encounter the many hardships that unavoidably attended their emigration to the new world, and to people the banks of its bays and rivers if the land under the water at their very doors was liable to immediate appropriation by another as private property; and the settler upon the fast land thereby excluded from its enjoyment, and unable to take a shell-fish from its bottom, or fasten there a stake, or even bathe in its waters without becoming a trespasser upon the rights of another. The usage in New Jersey has, in this respect, from its original settlement conformed to the practice of the other chartered colonies. And it would require very plain language in these letters patent to persuade us that the public and common right of fishery in navigable waters, which has been so long and so carefully guarded in England, and which was preserved in every other colony founded on the Atlantic borders, was intended, in this one instance, to be taken away. But we see nothing in the charter to require this conclusion.

[Martin et.al. v. Waddell.]

The same principles upon which the Court have decided upon the construction of the letters patent to the Duke of York, apply with equal force to the surrender afterwards made by the twenty-four proprietors. It appears by the special verdict, that all the interest of the duke in East New Jersey, including the royalties and powers of government, were conveyed to these proprietors, as fully and amply and in the same condition as they had been granted to him; and they had the same dominion and propriety in the bays, and rivers, and arms of the sea, and the soil under them, and in the rights of fishery, that had belonged to him under the original charter. In their hands, therefore, as well as in those of the duke, this dominion and propriety was an incident to the regal authority, and was held by them as a prerogative right, associated with the powers of government. And being thus entitled, they, in 1702, surrendered and yielded up to Anne, Queen of England, and to her heirs and successors, "all the powers and authorities in the said letters patent granted, to correct, punish, pardon, govern and rule all or any of her majesty's subjects or others, who then were inhabitants, or thereafter might adventure into or inhabit within the said province of East New Jersey; and also to nominate, make, constitute, ordain, and confirm any laws, orders, ordinances, directions, and instruments for those purposes, or any of them; and to nominate, constitute, or appoint, revoke, discharge, change, or alter any governor or governors, officers or ministers, which were or should be appointed within the said province; and to make, ordain, and establish any orders, laws, directions, instruments, forms, or ceremonies of government and magistracy, for, or concerning the same, or on the sea, in going to or coming from the same; or to put in execution, or abrogate, revoke, or change such as were already made, for or concerning such government, or any of them; and also all the powers and authorities by the said letters patent to use and exercise martial law in the said province of East New Jersey; and to admit any person or persons to trade or traffic there; and of encountering, repelling, and resisting by force of arms, any person or persons attempting to inhabit there without the license of them, the said proprietors, their heirs and assigns; and all other the powers, authorities, and privileges of and concerning the government of the province last aforesaid, or the inha-

bitants thereof, which were granted or mentioned to be granted by the said several above-recited letters patent, or either of them;" which said surrender was afterwards accepted by the queen.

We give the words of the surrender as found by the special verdict, and they are broad enough to cover all the jura regalia which belonged to the proprietors. They yield up "all the powers, authorities, and privileges of and concerning the government of the province;" and the right in dispute was one of these authorities and privileges. No words are used for the purpose of withholding from the crown any of its ordinary and well-known prerogatives. The surrender, according to its evident object and meaning, restored them in the same plight and condition in which they originally came to the hands of the Duke of York. Whatever he held as a royal or prerogative right, was restored, with the political power to which it was incident. And if the great right of dominion and ownership in the rivers, bays, and arms of the sea, and the soils under them, were to have been severed from the sovereignty, and withheld from the crown; if the right of common fishery for the common people, stated by Hale in the passage before quoted, was intended to be withdrawn, the design to make this important change in this particular territory would have been clearly indicated by appropriate terms; and would not have been left for inference from ambiguous language.

The negotiations previous to the surrender have been referred to, in order to influence the construction of the deed. But whatever propositions may have been made, or opinions expressed before the execution of that instrument, the deed itself must be regarded as the final agreement between the parties; and that deed, by its plain words, re-established the authority of the crown, with all of its customary powers and privileges. And when the people of New Jersey took possession of the reins of government, and took into their own hands the powers of sovereignty, the prerogatives and regalities which before belonged either to the crown or the parliament, became immediately and rightfully vested in the state.

This construction of the surrender is evidently the same with that which it received from all the parties interested at the time it was executed. For it appears by the history of New Jersey,

as gathered from the acts, documents, and proceedings of the public authorities, that the crown and the provincial government established by its authority always afterwards in this territory, exercised the same prerogative powers that the king was accustomed to exercise in his English dominions. And, as concerns the particular dominion and propriety now in question, the colonial government from time to time authorized the construction of bridges with abutments on the soil covered by navigable waters; established posts; authorized the erection of wharves; and, as early as 1719, passed a law for the preservation of the oyster fishery in its waters. The public usages, also, in relation to the fisheries continued to be the same. And from 1702, when the surrender was made, until a very recent date, the people of New Jersey have exercised and enjoyed the rights of fishery, for shell-fish and floating fish, as a common and undoubted right, without opposition or remonstrance from the proprietors. The few unimportant grants made by them at different times running into the navigable waters, which were produced in the argument, do not appear to have been recognised as valid by the provincial or state authorities, nor to have been sanctioned by the Courts. And the right now claimed was not seriously asserted on their part, before the case of Arnold *v.* Mundy, reported in 1. Halsted, 1; and which suit was not instituted until the year 1818: and, upon that occasion, the Supreme Court of the state held, that the claim made by the proprietors was without foundation.

The effect of this decision by the State Court, has been a good deal discussed at the bar. It is insisted by the plaintiffs in error that, as the matter in dispute is local in its character, and the controversy concerns only fixed property, within the limits of New Jersey, the decision of her tribunals ought to settle the construction of the charter; and that the Courts of the United States are bound to follow it. It may, however, be doubted, whether this case falls within the rule, in relation to the judgments of State Courts when expounding their own constitution and laws.

The question here depends, not upon the meaning of instruments framed by the people of New Jersey, or by their authority, but upon charters granted by the British crown; under which certain rights are claimed by the state, on the one hand. and by

private individuals, on the other. And if this Court had been of opinion that upon the face of these letters patent, the question was clearly against the state, and that the proprietors had been deprived of their just rights by the erroneous judgment of the State Court; it would, perhaps, be difficult to maintain that this decision of itself bound the conscience of this Court. It is, however, unquestionably entitled to great weight. It confirms the construction uniformly placed on these charters and instruments, by the other public authorities; and in which the proprietors had so long acquiesced. Public acts and laws, both of the colonial and state governments, have been founded upon this interpretation; and extensive and valuable improvements made under it. In the case referred to, the sanction of the judicial authority of the state is given to it. And if the words of the letters patent had been far more doubtful than they are, this decision, made upon such a question, with great deliberation and research, ought, in our judgment, to be regarded as conclusive.

Independently, however, of this decision of the Supreme Court of New Jersey, we are of opinion that the proprietors are not entitled to the rights in question; and the judgment of the Circuit Court must, therefore, be reversed.

Mr. Justice Thompson, and Mr. Justice Baldwin, dissented.


Mr. Justice THOMPSON.

The premises in question in this case are a mud-flat covered by the waters of the bay of Amboy, in the state of New Jersey. The cause comes up on facts found by a special verdict in the Court below; by which it appears that the lessors of the plaintiff produced upon the trial a regular deduction of title from Charles the Second down to themselves, and the premises in question are admitted to be within the grant. And the general question in the case is whether this mud-flat passed under the grant, and in virtue of the several conveyances set out in the special verdict, became vested in the proprietors of New Jersey, as private property. The opinion of a majority of the Court is against this right, in which opinion, however, I cannot concur, and shall briefly assign the reasons upon which my opinion rests.

Some objections have been made to the right of maintaining

an action of ejectment, growing out of the nature of the subject-matter in controversy. There can be no grounds for such an objection. The subject in question is the right to land, and not to water. It is the ordinary case of an ejectment for land covered with water, and the premises are so set out and described in the declaration; and the special verdict finds that the lessors of the plaintiff, under the title by them shown, entered into the tenements with the appurtenances in the declaration mentioned, and was thereof possessed until the defendant afterwards entered upon, and ejected, expelled, and removed the plaintiff from such possession. So that the subject-matter in controversy is found not only to be susceptible of actual possession, but to have been so possessed and enjoyed.

A majority of the Court seem to have adopted the doctrine of Arnold *v.* Mundy, decided in the Supreme Court of New Jersey, 1 Halst. 1, in which it is held, that navigable rivers, where the tide ebbs and flows, and the ports, bays, and coasts of the sea, including both the waters and the land under the water, are common to the people of New Jersey; and that, under the grant of Charles the Second to the Duke of York, all the rights which they call royalties passed to the duke as governor of the province, exercising the royal authority, and not as proprietor of the soil; but that he held them as trustee for the benefit of all settlers in the province, and that the proprietors did not acquire any such right to the soil; that they would grant a several fishery; and that no person who plants a bed of oysters in a navigable river, has such property in the oysters as to enable him to maintain an action of trespass against any one who encroaches upon it. And this rests on the broad proposition, that the title to the land under the water did not, and could not, pass to the Duke of York, as private property. To maintain this proposition, it must rest on the ground that the land under the water of a navigable river is not the subject of a private right; for it can be conveyed by words, the grant in the present case is broad enough to pass the title to the land in question.

It is worthy of observation that the course of New Jersey in relation to this claim is hardly consistent with her pretensions. In the case of Arnold *v.* Mundy the chief justice says, upon the Revolution all these rights became vested in the people of New

Jersey as the sovereign of the country, and are now in their hands; and the legislature may regulate them, &c. But the power which may be exercised by the sovereignty of the state, is nothing more than what is called the jus regium. The right of regulating, improving, and securing the same, for the benefit of every individual citizen. The sovereign power itself, therefore, cannot consistently with the principles of the law of nature and the constitution of a well-ordered society, make a direct and absolute grant of the waters of the state, divesting all the citizens of a common right. It would be a grievance which never could be long borne by a free people.

If this be the received doctrine in New Jersey in relation to the navigable waters of that state, and the oyster fisheries, they remain common to all the citizens of New Jersey, and never can be appropriated to any private or individual use, and all laws having such object in view must be utterly null and void; and it is difficult to perceive how the law of New Jersey, found by the special verdict, can be sustained. This act declares that the shore and land covered with water may be set apart and laid out by commissioners for the purpose of growing and planting oysters thereon, reserving such parts as might be judged necessary for public accommodation; provided that nothing in the said act contained should authorize the commissioners to present any obstruction, or cause any injury to the navigation of the said sound and river, or to any fishery or fisheries therein. Here the legislature treat these flats, in all respects as land, to be used for planting and growing oysters; and for the use of which a revenue is derived to the state, by the payment of a rent reserved. It is not the use of the water for any public purpose that this law contemplates; but an exclusive right to the use of the land under the water, in contradistinction to the use of the water for purposes of navigation; and that this law is so to be considered is manifest from the proviso that no obstruction should be made to the fishery or fisheries therein; and here is a manifest distinction made between a fishery and an oyster-bed. For if it had been understood that the fisheries included oysteries, the enacting clause and the proviso would present a glaring inconsistency. The enacting clause authorizes the setting apart the oystery to exclusive private use, when by the proviso no obstruction is to

[Martin et al. v. Waddell.]

be made to the fisheries.  So that if an oystery is a fishery, the owner is deprived of the exclusive use of it.  The act seems to be founded upon a distinction clearly held up in many cases to be found in the books, between an oystery and a fishery in the common use of the term.  The one applying to the use of land under the water, which is peculiarly adapted to the growing of oysters, and to be used for that purpose in the cultivation of oysters, as other lands are used for the purpose to which they are particularly adapted.  Whereas a fishery, in common acceptation, has reference to the use of the water for floating fish; and this is a very obvious and natural distinction.

That the title to land under a navigable stream of water must be held subject to certain public rights, cannot be denied.  But the question still remains, what are such public rights?  Navigation, passing and repassing, are certainly among those public rights.  And should it be admitted that the right to fish for floating fish was included in this public right, it would not decide the present question.  The premises in dispute are a mud-flat; and the use to which it has been and is claimed to be applied is the growing and planting of oysters.  It is the use of land, and not of water, that is in question.  For the purpose of navigation, the water is considered as a public highway, common to all; like a public highway on land.  If land over which a public highway passes is conveyed, the soil passes, subject to that use; and the purchaser may maintain an action for an injury to this soil not connected with the use; and whenever it ceases to be used as a public highway, the exclusive right of the owner attaches: so with respect to the land under water, the public use for passing and repassing, and all the purposes for which a public way may be used, are open to the public; the owner, nevertheless, retaining all the rights and benefits of the soil, that may not impede or interfere with the use as a public highway.  Should a coal-mine, for instance, be discovered under such highway, it would belong to the owner of the soil, and might be used for his benefit; preserving, unimpaired, the public highway.  So with respect to an oyster-bed, which is local, and is attached to the soil.  It is not the water that is over the beds that is claimed; that is common, and may be used by the public; but the use of the soil by the owner which is consistent with the use of the water by the public,

is reserved to the owner. Suppose this mud-flat should, by the wash from the shore, or the receding of the water, or in any other manner be filled up and become solid ground; which is by no means an extravagant supposition; would not the proprietors be considered the owners of this land, and have the exclusive right to the use and enjoyment of it, if they had in no way parted with such right. This cannot be denied, if the soil passed to and became vested in the proprietors under the grant to them. It surely would not be claimed by the state, it being no longer susceptible of public use.

The case of Brown v. Kennedy, 5 Har. & Johns. 195, is fully to this point. The question there related to the right to the soil in the bed of a navigable river, which had been diverted to a canal; and it was held, that the property in the soil covered by the water was vested in the lord proprietary, by the charter of Maryland. That by the common law, the right was in the king, and he might dispose of it sub modo. That the property in the soil may be granted, subject to the jus publicum. That by the terms of the charter to Lord Baltimore, they clearly passed the property in the soil covered by any waters within the limits of the charter. And if the bed of the river had not been conveyed away, it would have remained in the proprietary; and if an island had sprung up, it would have been his; or if the bed of the river had been left bare, it would be his, as the jus publicum would be destroyed.

The rules and principles laid down by Lord Hale, as we find them in Hargrave's Law Tracts, are admitted as containing the correct common law doctrine as to the rights and power of the king over the arms of the sea and navigable streams of water. We there find it laid down, that the King of England hath a double right in the sea, viz.; a right of jurisdiction, which he ordinarily exercises by his admiral, and a right of propriety or ownership. Hargrave, 10. The king's right of propriety or ownership in the sea and soil thereof, is evinced principally in these things that follow.

The right of fishing in the sea, and the creeks, and arms thereof, is originally lodged in the crown; as the right of depasturing is originally lodged in the owner of the coast whereof he is lord, or as the right of fishing belongs to him that is the owner of a private or inland river. But though the king is the owner of this

great coast, and as a consequent of his proprietary hath the primary right of fishing in the sea, and the creeks, and arms thereof; yet the common people of England have regularly a liberty of fishing in the sea, or creeks, or arms thereof as a public common of piscary, and may not without injury to their right be restrained of it, unless in such places, creeks, or navigable rivers, where either the king or some particular subject hath gained a propriety exclusive of that common liberty. (11)   In many ports and arms of the sea, there is an exclusion of public fishing by prescription or custom, (12) although the king hath primâ facie this right in the arms and creeks of the sea, communi jure, and in common presumption; yet a subject may have such a right in two ways.

1. By the king's charter or grant: and this is without question. The king may grant fishing within some known bounds, though within the main sea, and may grant the water and soil of a navigable river; (17) and such a grant (when apt words are used) will pass the soil itself; and if there shall be a recess of the sea, leaving a quantity of land, it will belong to the grantee.   The second mode is by custom or prescription.   There may be the right of fishing without having the soil, or by reason of owning the soil, or a local fishery that arises from ownership of the soil. (18) That, de communi jure, the right of the arms of the sea belong to the king; yet a subject may have a separate right of fishing, exclusive of the king and of the common right of the subject. (20) But this interest or right of the subject must be so used as not to occasion a common annoyance to the passage of ships or boats; for that is prohibited by the common law, as well as by several statutes.

For the jus privatum that is acquired to the subject either by patent or prescription, must not prejudice the jus publicum, wherewith public rivers or arms of the sea are affected for public use, (22)—as the soil of an highway in which, though in point of property, may be a private man's freehold, yet it is charged with a public interest of the people, which may not be prejudiced or damnified, (36).

These rules, as laid down by Lord Hale, have always been considered as settling the law upon the subjects to which they apply, and have been understood by all elementary writers as governing rules, and have been recognised by Courts of justice

as controlling doctrines. They establish that by the common law the king is the owner of all navigable rivers, bays, and shores. That he owns them in full dominion and propriety, and has full power and authority to convey the same; that he may grant a several fishery in a navigable stream, and the common law has annexed only two limitations upon this power. That these waters shall remain highways for passage and navigation, and that whilst they remain ungranted, there is a common right of fishery in them; but, subject to these limitations, the king has as full power to convey as an individual has to convey the land of which he is the owner.

I see nothing to countenance the distinctions set up, that the king holds these subject as trustee, any more than he does the dry land; or that he cannot convey them, discharged of the right of common fishery. There is no reason for such distinction with respect to land under water. The true rule on the subject is, that primâ facie a fishery in a navigable river is common, and he who sets up an exclusive right, must show title either by grant or prescription. This is the doctrine of the King's Bench, in England, in the case in 4 Burr. 2163. It was an action of trespass for breaking and entering the plaintiff's close, called the river Severn; and the defence set up was, that it was a navigable river, and an arm of the sea, wherein every subject has a right to fish; and that an exclusive right cannot be maintained by a subject in a river that is an arm of the sea, but that the general right of fishing is common to all. But this doctrine was not recognised by the Court. Lord Mansfield said, the rule of law is uniform. In rivers not navigable the proprietors of the land have the right of fishing on their respective sides, and it generally extends ad filum medium aquæ. But in navigable rivers, the proprietors of the land on each side have it not. The fishery is common. It is primâ facie in the king, and is public. If any one claims it exclusively, he must show a right. If he can show a right by prescription, he may then exercise an exclusive right; though the presumption is against him, unless he can prove such a prescriptive right. Here it is claimed and found. It is therefore consistent with all the cases, that he may have an exclusive privilege of fishing, although it is an arm of the sea, such a right shall not be presumed; but the contrary, prima facie; but it is capable of being proved, and must

have been so in the present case. And Yates, Justice, says, he was concerned in such a case but the right was not proved, and so found common; but such a right may be proved. It may be appropriated by prescription; and he refers to the royal salmon fishery in the river Banne, in Sir John Davies's Reports, and says it is agreeable to this, and that it is a very good case. That it appears by it that the crown may grant a several fishery in a navigable river where the sea flows and reflows, or in the arm of the sea. And he refers to the case 1 Mod. 105, where, he observes, Lord Hale says truly if any one will appropriate a privilege to himself, the proof lieth on his side. Now, if it may be granted, it may be prescribed for: for a prescription implies a grant.

In the argument of this case, the counsel on the part of the defendant referred to the case of Warren v. Mathews, as reported in 6 Mod. 73, where it is said, every subject of common right may fish with lawful nets, &c., in a navigable river, as well as in the sea, and the king's grant cannot bar them thereof; and this case has been much relied on in the argument of the case now before the Court. But this report of the case in 6 Mod. 73 is clearly a mistake. It is the only case to be found in which the broad proposition here stated is recognised, that the king's grant cannot bar the subject of the common right of fishing. And in the report of the same case, 1 Salk. 357, the case as stated is, that one claimed solam piscariam, in the river Ex, by a grant from the crown. And, Nott, Chief Justice, said, the subject has a right to fish in all navigable rivers as he has to fish in the sea; and a quo warranto ought to be granted to try the title of this grantee, and the validity of his grant. Lord Nott, here, no doubt, meant to speak of the primâ facie right of the subject. For if he intended to say that no such exclusive right could be given by grant from the king, it would be absurd to issue a quo warranto to try the title and validity of the grant, if by no possibility a valid grant could be made. At all events, it is very certain that the King's Bench, in the case of Carter v. Murcot, did not recognise the doctrine of Warren and Mathews, as reported in 6 Mod. 73. And under these circumstances, it is entitled to no weight in the decision of the case now before the Court.

It is unnecessary to refer to the numerous cases in the English books on this subject; the doctrine as laid down in the case of

2 N 2                54

Carter *v.* Murcot is universally recognised as the settled law on the subject, and is fully adopted and sanctioned by the Courts of this country. Numerous cases of this description have come before the Courts in the state of New York, and the principles and rules as laid down in the case of Carter *v.* Murcot fully recognised and adopted. In the case of James and Gould, 6 Cowen, 376, the Court, in referring to that case, place the decision upon it, and say, "This is the acknowledged law of Great Britain and of this state; and cases are referred to showing such to be the settled law."

In the case of Johnson *v.* M'Intosh, 8 Wheat. 595, this Court say, that according to the theory of the British constitution all vacant lands are vested in the crown as representing the nation, and the exclusive power to grant them is admitted to reside in the crown as a branch of the royal prerogative. And this principle is as fully recognised in America as in Great Britain. All the lands we hold were originally granted by the crown. Our whole country has been granted; and the grants purport to convey the soil as well as the right of dominion to the grantee. Here the absolute ownership is recognised as being in the crown, and to be granted by the crown, as the source of all title; and this extends as well to land covered by water as to the dry land; otherwise, no title could be acquired to land under water. There is in this case no intimation that any of the lands are vested in the crown as trustee, but as absolute owner. If lands under water can be granted and are actually granted, the grantees must of course acquire all the right to the use and enjoyment of such lands of which they are susceptible as private property, as much so as the dry land; and there can be no grounds for any implied reservation of ungranted rights in the one case more than in the other; and the grant of the soil carries with it, of course, all the uses to which it may be applied, among which is an exclusive or several fishery. All grants of land, whether dry land or covered with water, are for great public purposes subject to the control of the sovereign power of the country. So the grant of the soil under water, which carries with it a several fishery, is subject to the use of the water for the public purposes of navigation, and passing and repassing; but it is nowhere laid down as the law of the land, that a several fishery is a part of the jus publicum, and open to the use of the public. So long as the

fishery remains ungranted, it is common, and may be used by the public; but when granted to individuals, it becomes private property as much as any other subject whatever; and I think the law is too well settled, that a fishery may be the subject of a private grant, to be at this day drawn in question.

If, then, according to the principles of the common law, the king had the power to grant the soil under the waters of a navigable stream, where the tide ebbs and flows; and if such grant of soil carries with it the right of a several fishery, to the exclusion of a public use, the remaining inquiries are whether the grant of Charles the Second to the Duke of York, in the year 1664, did convey the premises in question ; and if so, then, whether this right was surrendered by the proprietors of New Jersey to Queen Anne, in the year 1702.

This charter to the Duke of York is one containing not only a grant of the soil, but of the powers of government. This Court, in the case of Johnson v. M'Intosh, in noticing the various charters from the crown, observe, that they purport to convey the soil and right of dominion to the grantees. In those governments which were denominated royal, where the right to the soil was not vested in individuals, but remained in the crown, or was vested in the colonial government, the king claimed and exercised the right of granting the lands. Some of these charters purport to convey the soil alone, and in those cases in which the powers of government as well as the soil are conveyed to individuals, the crown has always acknowledged itself to be bound by the grant; and in some instances, even after the powers of government were revested in the crown, the title of the proprietors of the soil was respected. The Carolinas were originally proprietary governments; but in 1721 a revolution was effected by the people who shook off their obedience to the proprietors, and declared their dependence immediately on the crown, and the king purchased the title of those proprietors who were disposed to sell. Lord Carteret, however, who was one of the proprietors, surrendered his interest in the government, but retained his title to the soil; and that title was respected till the Revolution, when it was forfeited by the laws of war.

This shows the light in which these charters, granting the soil, were considered by this Court. That they conveyed an absolute

interest in the soil, and passed every thing susceptible of private and individual ownership, of which a fishery is certainly one, according to the settled law, by the authorities I have referred to. Subject always, as before mentioned, to the jus publicum. or rights of navigation and trade; but of which the right of a common fishery forms no part, after the soil has been conveyed as private property.

It is unnecessary to notice particularly the various charters and mesne conveyances set out in the special verdict. It was admitted on the argument, that the premises in question fall within these conveyances; and vested in the proprietors of New Jersey all the right and title both of soil and the powers of government, which passed to the Duke of York under the charter of Charles the Second. The terms employed in the description of the rights conveyed, are of the most comprehensive character, embracing the land, soil, and waters. After a general description and designation of the territory embraced within the charter, and comprehending the premises in question, it adds, "Together with all the lands, islands, soils, rivers, harbours, mines, minerals, quarries, woods, marshes, waters, lakes, fishings, hawkings, huntings, and fowlings, and all other royalties, profits, commodities, and hereditaments, to the said several islands, lands, and premises, belonging and appertaining with all and every of their appurtenances, and all our estate, right, title, interest, benefit, advantage, claim, and demand of, in, or to the said lands, and premises, or any part or parcel thereof, and the reversion and reversions, remainder and remainders thereof, to have and to hold all and singular, the premises hereby granted, or herein mentioned, unto our brother James, Duke of York, his heirs and assigns forever; to be holden of us our heir and successor in free and common soccage." If these terms are not broad enough to include every thing susceptible of being conveyed, it is difficult to conceive what others could be employed for that purpose. The special verdict after setting out the mesne conveyances, by which the title is deduced down to the proprietors of New Jersey, sets out a confirmation of the title in the proprietors by Charles the Second, as follows, "And the jurors on their oath aforesaid further say, that the said Charles the Second, afterwards, to wit, on the twenty-third day of November, in the year of our Lord one thousand six hundred

and eighty-three, by a certain instrument in writing duly executed, bearing date on the same day and year last aforesaid; and reciting the said last-mentioned indenture from the said Duke of York, to the said twenty-four proprietors, did recognise their right to the soil and government of the said province of East New Jersey, whereof the tenements aforesaid with the appurtenances in the declaration aforesaid are parcel, and did strictly charge and command the planters and inhabitants, and all other persons concerned in the same, to submit and yield all due obedience to the laws and government of the said twenty-four proprietors, their heirs and assigns, as absolute proprietors and governors thereof, who in the words of the said instrument in writing, had the sole power and right, derived under the said Duke of York, from him, the said Charles the Second, to settle and dispose of the said province of East New Jersey, upon such terms and conditions, as to the twenty-four proprietors, their heirs and assigns should deem meet." Here is the most full recognition and confirmation of the right and title of the proprietors to the soil, with the absolute power to dispose of the same in such manner as they should think proper. The absolute ownership could not be expressed in a more full and unqualified a manner. In the case of Fairfax v. Hunter's Lessee, 7 Cranch, 618, the question was as to the legal effect and operation of certain descriptive words in a charter of Charles the Second; and Mr. Justice Story in giving the opinion of the Court, said, "The first question is, whether Lord Fairfax was proprietor of and seised of the soil, of the waste and unappropriated lands in the northern neck by virtue of the royal grants of Charles the Second, and James the Second; or whether he had mere seignoral rights therein as lord paramount, disconnected with all interest in the land, except of sale and alienation. The royal charter expressly conveys all that entire tract, territory, and parcel of land, situate, &c., together with all the rivers, islands, woods, timber, &c., mines, quarries of stone, and coal, &c., to the grantees and their heirs and assigns, to their only use and behoof, and to no other use, intent, or purpose whatsoever." "It is difficult," say the Court, "to conceive terms more explicit than these to vest a title and interest in the soil itself. The land is given, and the exclusive use thereof; and if the union of the title, and the exclusive use do not constitute the complete and absolute

dominion in the property, it will not be easy to fix any which shall constitute such dominion." The terms here used are certainly not more broad and comprehensive than those used in the charter under consideration; and if they will pass the right to the soil in the one case, they certainly must in the other. The land in the one case being covered with water, and in the other not, can make no difference as to the passing of the title, if land under water can be conveyed at all; and whatever the public right to the use of the water may be, it can give no right to the use of the land under the water, which has by the grant become private property. And if, as I think the authorities clearly show, a grant of the soil carries with it the right to every private use to which it can be applied, including the cultivation of oysters, there can be no ground upon which this can be claimed as a common right. A several fishery and a common fishery are utterly incompatible with each other. The former is founded upon and annexed to the right of soil. And when that right of soil is acquired by an individual, the several fishery begins, and the common fishery ends.

Did the proprietors, then, by the surrender to Queen Anne, in the year 1702, relinquish any rights of private property in the soil derived under the charter of Charles the Second? I think it is very clear that they surrendered nothing but the mere powers of government granted by the charter, retaining unaffected in any manner whatever the right of private property.

The special verdict states this surrender as follows: "That on the fifteenth day of April, in the year one thousand seven hundred and two, the said twenty-four proprietors and the other persons, in whom, by sundry mesne conveyances and assurances in the law, the whole estate, right, title, and interest in the said province of East New Jersey, were vested at the said last-mentioned date, as proprietors thereof, by an instrument in writing under their hands and seals, bearing date the same day and year last aforesaid, did for themselves and their heirs surrender and yield up unto Anne, Queen of England, &c., and to her heirs and successors, all the powers and authorities in the said letters patent granted, to correct, punish, pardon, govern, and rule all or any of her said majesty's subjects or others who then were, as inhabitants, or thereafter might adventure into, or inhabit within the

said province of East New Jersey. And also to nominate, make, constitute, ordain, and confirm any laws, orders, ordinances, directions, and instruments for those purposes, or any of them; and to nominate, constitute or appoint, revoke, discharge, change or alter any governor or governors, officers or ministers, which were or should be appointed within the said province; and to make, ordain, and establish any orders, laws, directions, instruments, forms, or ceremonies of government and magistracy for or concerning the same, or on the sea, in going to or coming from the same, or to put in execution or abrogate, revoke or change such as were already made for or concerning such government, or any of them. And also the powers and authorities by the said letters patent granted, to use and exercise martial law in the said province of East New Jersey. And to admit any persons to trade or traffic there. And of encountering, repelling, and resisting by force of arms, any person or persons attempting to inhabit there without the license of them, the said proprietors, their heirs and assigns. And all other the powers, authorities, and privileges of and concerning the government of the province last aforesaid, or the inhabitants thereof, which were granted, or mentioned to be granted by the said several above-recited letters patent, or either of them. And that the said Queen Anne afterwards, to wit, on the seventeenth day of the same month of April, in the year last aforesaid, did accept of the said surrender of the said powers of government, so made by the said proprietors, in and over the premises last aforesaid."

I do not perceive, in this surrender, a single term or expression that can in the remotest degree have any reference to the private property conveyed by the grant, or to any matter except that which related to the powers of government. All the enumerated subjects manifestly have relation only to such powers. And after this specification of particulars comes the general clause, "and all other the powers, authorities, and privileges of and concerning the government;" necessarily implying that the specified subjects related to the powers of government; and the acceptance by the queen manifestly limits the surrender to such powers; she accepts the said surrender of the said powers of government so made by the proprietors in and over the premises.

If there was any thing in the language here used, which could

in the least degree render doubtful the object and purpose of this surrender, the memorials of the proprietors, and the correspondence which took place on the subject referred to on the argument, as contained in the collection of Leaming and Spicer, must remove all doubt, and show that the surrender was confined exclusively to the powers of government, and intended to operate, not only as a surrender of such powers, but as a confirmation of all right and title to the soil and private property of the proprietors. And if so, the proprietors' right must depend upon the power of the king to grant the right claimed in the premises, and the construction of the charter, as to what it does embrace. And, I have endeavoured to show, that by the settled and uncontradicted principles of the common law, the king had the power to grant the land under the water of a navigable river; and, that such grant carries with it to the grantee all rights of private property of which the land is susceptible, subject to the jus publicum. That the grant of the soil necessarily carries with it a several and exclusive fishery, which is utterly incompatible with the rights of a common fishery, and which of course can form no part of the jus publicum; and that the grant in question of Charles the Second to the Duke of York, conveyed all private right in the soil which could be conveyed by the king; all which rights, by sundry mesne conveyances, became vested in the proprietors of East New Jersey, and from them to the lessor of the plaintiff. And I can discover nothing in the authorities giving countenance to the idea that the king held the land covered by the waters of a navigable river as trustee, or by a tenure different from that by which he held the dry land. And I must again repeat, if the king held such lands as trustee for the common benefit of all his subjects, and inalienable as private property, I am unable to discover on what ground the state of New Jersey can hold the land discharged of such trust, and can assume to dispose of it to the private and exclusive use of individuals. If it was a trust estate in the king for the benefit of his subjects, and upon the Revolution, the government of New Jersey became the trustee in the place of the king, and the trust devolved upon such government, and the land became as inalienable in the government of New Jersey as in the hands of the king, and the state must be bound to hold all such lands subject to the trust, which, as contended, embraces

[Martin et al. *v.* Waddell.]

a common right of fishery in the waters, and the dredging for oysters in the land covered by the waters; and if this be so, there certainly can be no power in the state, without a breach of trust, to deprive the citizens of New Jersey of such common right, and convert these oyster grounds to the private and exclusive use of individuals.

There is nothing in the case, in my judgment, showing a usage in the state by which the proprietors have either directly or by implication relinquished or abandoned any right of property which they derived under the charter of Charles the Second. All the authority exercised by the state in granting ferries, bridges, turnpikes, and rail-roads, &c., are the exercise of powers vested in the government over private property for public uses, and formed a part of the powers of government surrendered by the proprietors to Queen Anne; and it is only since the decision in Arnold *v.* Mundy, that the private right of the proprietors to the lands under the waters in New Jersey has been denied, and assumed by the state to grant the same to individuals; and even in such cases it has been done cautiously, and apparently with hesitation as to the right of the state. In the two cases referred to on the argument, of a grant to N. Burden, on the 8th of November, 1836, and to Aaron Ogden, on the 25th of January, 1837, of land under the water, the grant is a mere release or quit claim of the state; but the proprietors have been in the habit of making grants for land under the water from the time of the surrender to Queen Anne down to the year 1820, and numerous instances of such grants were referred to on the argument.

With respect, however, to the right of fishery, there is in my judgment a marked distinction, both in reason and authority, between the right in relation to floating fish, and the right of dredging for oysters. The latter is entirely local and connected with the soil. There are natural beds of oysters, but in other places there is a peculiar soil, adapted to the growing of oysters. They are planted and cultivated by the hand of man like other productions of the earth; and the books in many cases clearly holds up such a distinction, and speak of the oyster fishery as distinct from that of floating fish, 5 Burr. 2814; and in the case of Rogers and others *v.* Allen, Camp. Rep. 309, this distinction is expressly taken. It was an action of trespass for breaking and entering

[Martin et al. *v.* Waddell.]

the several oyster fishery of the plaintiffs in Burnham river, and fishing and dredging for oysters.   The defence set up was that the locus in quo was a navigable river, in which all the king's subjects had a right to fish and dredge for oysters; and evidence was introduced showing that all who chose had been accustomed to fish in Burnham river for all sorts of floating fish without interruption; and it was contended that a fishery was entire, and that as it had been proved that it was lawful for all the king's subjects to catch floating fish, so they might lawfully dredge for oysters.   But Heath, Justice, ruled otherwise, and said a fishery was divisible; a part may be abandoned, and another part of more value may be preserved.   The public may be entitled to catch floating fish in the river Burnham, but it by no means follows that they are justified in dredging for oysters, which may still remain private property: and although a new trial was granted upon another point in the case, the doctrine as above stated was not at all impugned by the Court of King's Bench.

Upon the whole, I am of opinion that the judgment of the Circuit Court ought to be affirmed.