636     COURT OF ERRORS AND APPEALS.

Phila. Brewing Co. v. McOwen.     76 N. J. L.

PHILADELPHIA BREWING COMPANY, DEFENDANT IN ERROR, v. FREDERICK McOWEN, PLAINTIFF IN ERROR.

Argued July 1, 1908—Decided March 1, 1909.

One of two grantees of a common grantor may assert as against the other a title different from or paramount to that derived from the common grantor.

On error to the Circuit Court.

For the plaintiff in error, *Joseph Kaighn* and *French & Richards*.

For the defendant in error, *Wilson, Carr & Stackhouse* and *Bleakly & Stockwell*.

The opinion of the court was delivered by

GARRISON, J. This is an action of ejectment for lands lying beneath the waters of the river Delaware. The *locus in quo* described in the declaration has a base of two hundred and thirty-eight and ninety-four hundredths feet in a line drawn parallel with Front street, of the city of Camden, and three hundred and twenty feet to the west of the westerly side thereof, which line so drawn is below the high-water line of the river. This base of two hundred and thirty-eight and ninety-four hundredths feet is the easternmost boundary of the *locus in quo,* and if extended westwardly out into the river until the exterior wharf line is reached, will include the land for which this suit is brought, which each party claims under the state's riparian grant.

It will be observed that the tract of land under water thus described does not adjoin the fast land on the Jersey shore, but that between the easterly end or base of such tract and the shore the river Delaware rises at high tide; that is to say, the river at high water intervenes between the easternmost boundary of the *locus in quo* and the fast land of the shore.

It is upon this fact that the plaintiff relies as the ground of its present action.

Originally, of course, the land described in the plaintiff's declaration belonged to the State of New Jersey, and each of the parties to the present action has a grant from the riparian commissioners which in its descriptive portion covers the *locus in quo*. The defendant's grant was earlier in point of time but the plaintiff contends, and its present action is based upon the proposition of fact, that the defendant is not now, and was not when he got his riparian grant, the owner of any land adjoining the *locus in quo,* and hence that he did not by the said grant acquire the rights of the state therein; but that on the other hand the plaintiff's grant covering the same lands was duly supported by its ownership of the *ripa* opposite the *locus in quo, i. e.,* the land adjoining the waters of the river that intervene between the *locus in quo* and the high-water line on the Jersey shore. If the plaintiff's proposition of fact is true its legal proposition is also correct, for the defendant's grant from the state expressly provided that such grant should be void "if the said Frederick McOwen is not the owner of the land adjoining the land under water hereby granted."

The fundamental question therefore is whether or not the defendant was the owner of land on which the river rose at high water adjoining the *locus in quo*. In more concrete form the precise question is whether the Pavonia Land Association, which was the common grantor, had conveyed to the defendant, who was the earlier grantee, any land adjoining the *locus in quo,* or whether such common grantor did not remain the owner of the land at high water to the east of the *locus in quo* until by a subsequent conveyance it conveyed such land to the immediate grantor of the plaintiff.

At the trial the plaintiff made out a case under its declaration by proving the following facts: On October 18th, 1893, the Pavonia Land Association owned a city block on the easterly bank of the Delaware river, extending from Dupont street on the south to Cooper avenue on the north, bounded on the east by Front street, of the city of Camden, and on the west by the Delaware river, whose waters washed the entire

front of the lot, a distance of over four hundred feet. The shore line of mean high tide was not, however, exactly parallel with Front street, from the westerly side of which the shore was more than three hundred and twenty feet distant at the northerly end of the lot although not at the southerly end. In other words, the river at this point describes a double curve somewhat similar to a capital S, so that at the south end of the lot the river bellied into the land and at the north end the land jutted out into the river. This incurve in the southerly half of the lot would cut a straight line parallel with Front street and three hundred and twenty feet west of its westerly side at two points, the distance between which would be two hundred and thirty-eight and ninety-four hundredths feet, for which distance such line would run wholly beneath the waters of the river. This two hundred and thirty-eight and ninety-four hundredths feet is the base or easterly boundary of the *locus in quo,* which extends westwardly out to the exterior wharf line. The significance of the line three hundred and twenty feet from the westerly side of Front street and parallel thereto is that such a line is, by the deed from the Pavonia Land Association to the defendant, dated October 18th, 1893, made the easterly boundary of the land thereby conveyed. In other words, the defendant, by his said deed, got all of the land that the association owned to the west of such line, *i. e.,* between such line and the Delaware river, but got thereby no land to the east of such line, *i. e.,* between such line and Front street. The land between such line and Front street remained the property of the association until June 17th, 1895, when it conveyed it to the immediate grantor of the plaintiff. If therefore at the southerly end of the tract conveyed to the defendant such line, on October 18th, 1893, ran for a distance of two hundred and thirty-eight and ninety-four hundredths feet through the waters of the river, *i. e.,* below its high-water line, the defendant, as to such distance, got title to no land for the reason that the title to the land so under water was not in his grantor but in the State of New Jersey; from this it also follows that the defendant got no title to such land under water from the

State of New Jersey by his riparian grant for the reason that as to such two hundred and thirty-eight and ninety-four hundredths feet he was not the owner of any adjoining land which by the express provision of his grant was an essential condition of its validity. This was the plaintiff's case, which was not contradicted by any oral testimony offered by the defendant. The plaintiff having proved the foregoing state of facts rested its case, and the defendant having introduced certain documentary evidence also rested, whereupon each counsel requested the court to direct a verdict in his favor, plaintiff's counsel relying upon the uncontroverted state of facts, defendant's counsel relying upon certain propositions of law based upon documentary evidence that he had introduced. Each counsel admitted that there was no question touching the case made by the plaintiff that required to be submitted to the jury. The trial judge, after argument, denied the defendant's motion and directed a verdict for the plaintiff, to which rulings exceptions were severally allowed and sealed.

On this writ of error the defendant below, who is now the plaintiff in error, relies upon the propositions of law advanced by him in the trial court as grounds for the granting of the motion he then made. If, however, in view of any of such propositions it was error for the trial court to direct a verdict for the defendant in error, the plaintiff in error may avail himself thereof.

The propositions in question have therefore been examined with the view of determining whether error was committed at the trial either in the denial of the motion then made by the plaintiff in error or in the granting of that made by the defendant in error.

The first proposition relied upon for reversal is that the riparian grant made to the defendant in error inured as matter of law to the plaintiff in error by way of estoppel. The line of reasoning upon which this proposition is invoked is that the common grantor, *i. e.*, the Pavonia Land Association, claiming to own what it conveyed to the plaintiff in error, warranted its title thereto, so that if such grantor had acquired the state's title to the land in question it could not

have asserted such title against the plaintiff in error; therefore (it is argued) when such title was acquired by the defendant in error, a subsequent grantee of the common grantor, the same disability attached to it as if the common grantor had itself acquired the state's grant. The conclusion, however, is a *non sequitur* from the premises. If the defendant in error was setting up against the plaintiff in error no title other than the title it got from the common grantor, a question would be presented that is not now before us. In the present case the claim of the defendant in error is made under a title that it did not get from the common grantor, a paramount title derived directly from the state. There is no rule of law that prevents one of two grantees of a common grantor from asserting against the other a title different from or paramount to that derived from the common grantor. 16 *Cyc.* 716, *note* 60.

The next proposition is that the riparian act under which the defendant in error got the state's grant did not authorize such grant, because such act is by its title limited to "lands lying under the waters of the bay of New York and elsewhere in this state."

The argument upon this point is that "if the words 'and elsewhere' were omitted, the statute would clearly apply to nothing but the bay of New York;" to which the plenary answer is that the words "and elsewhere" were not omitted.

The next contention is that the rights obtained from the state by the defendant in error cannot be asserted in this case for the reason that certain rents due the state are in arrears. This fact, if true, does not in a legal sense concern the plaintiff in error. As to such matters the state is represented by agencies of its own creation, of which the plaintiff in error is not one.

Next it is claimed that "the state never acquired any title to the land in question." This contention involves the affirmative of the proposition that the land in suit, although originally granted by the Duke of York through mesne conveyances to the Proprietors was not included in the surrender made by the latter to the Crown in 1702, and hence did not

repass to the State of New Jersey after the revolution. This large claim rests for its sole proof upon the single circumstance that there is found among the records in the surveyor-general's office at Burlington a record of a re-survey of land made in 1734 which recites that the land re-surveyed was part of five hundred acres formerly surveyed to Samuel Coles and granted by said Coles to Jacob Spicer in 1685. The argument is that if this recital be accepted as evidence of the facts stated in it it puts the five hundred acres referred to out of the Proprietors prior to 1702, so that such land was not included in their act of surrender.

The argument thus made assumes as its major premise that "title to the land under tidewater passed by the grant from Charles II. to the Duke of York," citing in support of this proposition *Martin* v. *Waddell,* 16 *Pet.* 367, and *American Dock and Improvement Co.* v. *Trustees,* 12 *Stew. Eq.* 409. Martin *v.* Waddell was decided by the Supreme Court of the United States in 1842 and was reprinted in our state reports for that year. 3 *Harr.* 495. In the opinion delivered by Chief Justice Taney, the principal matter discussed was whether the grant of Charles II. to the Duke of York separated the "soils" under navigable waters in this state from "the other royalties" so as to convert them into private property, or whether such "soils" passed to the Duke of York to be held by him, as, since *Magna Charta,* the king himself had held them, *i. e.,* "of common liberty," as Lord Hale characterizes "the *jura regalia." De Juris Maris, Harr. R. L.* 711.

Chief Justice Taney construed the grant as having the latter effect. "No words," he says, "are used for the purpose of separating them from the *jura regalia* and converting them into private property." Upon this point the opinion concludes with these words: "In the judgment of the court the land under the navigable waters passed to the grantee as one of the royalties incident to the powers of government; and were to be held by him in the same manner and for the same purposes that the navigable waters of England and the soils under them are held by the Crown."

In 1870 Chief Justice Beasley, delivering the opinion of

this court in *Stevens* v. *Paterson and Newark Railroad Co.*, 5 *Vroom* 532, said: "In my opinion it is entirely indisputable that the Proprietors of New Jersey did not, under the grant from the Duke of York, take any property in the soil of navigable rivers within the ebb and flow of the tides. This was the very point of decision in *Arnold* v. *Mundy*, 1 *Halst.* 1, and *Martin* v. *Waddell*, 16 *Pet.* 367." The case of Martin *v.* Waddell, therefore, does not sustain the argument in support of which it is cited by the plaintiff in error.

The other case cited was American Dock and Improvement Co. *v.* Trustees. In this equity case it appears that Mr. Justice Depue, charging the jury in an issue of law out of chancery, said: "These rights in lands under tidewaters in the province of East Jersey were granted by Charles II. to the Duke of York by the charters of 1664 and 1674, and the land or soil under such waters passed to the Duke of York, *to be held by him in the same manner as the soil under the navigable waters of England* was held by the Crown," citing *Martin* v. *Waddell*, 16 *Pet.* 367, and *Stevens* v. *Paterson and Newark Railroad Co.*, 5 *Vroom* 532. The only action of the Court of Chancery in this case was to deny a new trial.

It would seem, therefore, that unless this court is prepared to recede from the views expressed in Stevens *v.* Paterson and Newark Railroad Co., the Duke of York did not take in lands under the navigable waters of this state that private property therein that is necessary to sustain the argument and trial theory of the plaintiff in error. For if the Duke of York did not take in such lands the property to low water he could not have transferred such property to the Proprietors, and if the Proprietors did not have it they could by no act of theirs vest in Samuel Coles a title to private property they themselves did not possess, so that such property should remain in their grantee notwithstanding their surrender to the Crown in 1702.

Inasmuch, however, as we have not had the benefit of counsels' views upon this precise phase of the case the matter now under consideration will be disposed of upon grounds directly within the lines of their argument.

The documentary evidence under consideration is a re-survey of land made to Jacob Spicer in 1734, the recitals of which, it is claimed, show that such re-survey is part of a survey of five hundred acres of land made to Samuel Coles prior to 1685, and also that Jacob Spicer, at the time of his application for such re-survey in 1734, "stands lawfully Seized of two hundred and sixty (260) acres of the above said Five Hundred Acres of land." Then follows a survey to Jacob Spicer by metes and bounds which concludes: "Containing Three Hundred and sixty acres of land Besides the usual allowance for roads. And whereas it appears by the above re-survey that *their* is one hundred acres of over Plus Land within the above mentioned and described Meetes and Bounds thereof. Therefore By virtue of a warrant from the Councill of Proprietors to me directed Bearing date ye Twelfth day of February Anno Domini one thousand seven hundred and seventeen requiring me to survey unto Isaac DeCou the full quantity of eleven hundred acres of land," &c., and the recital then traces an assignment of three hundred acres of the DeCou warrant to Jacob Spicer and concludes: "Therefore I have caused one hundred acres part of said three hundred acres to be surveyed to the said Jacob Spicer *within the bounds aforesaid* and the said *overplush* of one hundred acres of Land is hereby certified to have been surveyed to the said Jacob Spicer."

It is evident therefore, assuming all that is argued, that the survey to Jacob Spicer in 1734 rested in part upon the survey to Samuel Coles said to be prior to 1685 and in part upon a warrant made to Isaac DeCou in 1717, and that it is impossible to tell, assuming that the survey of 1734 covered the *locus in quo,* whether such particular part of the three hundred and sixty acres was originally in the Coles survey or came into the Spicer survey as "overplush" by force of the DeCou warrant, which was in 1717, and hence after the surrender to the Crown. Nothing therefore was shown, even inferentially, by this documentary evidence that could have been accepted by the trial court or that should have been submitted to the jury.

The next contention is that "rights adverse to the state were acquired by the operation of a shore fishery on the land in question."

Such rights adverse to the state were not established at the trial, nor is any legal error of the trial court in dealing with the testimony upon this branch of the case pointed out.

The production of certain "descriptions of fisheries" and the self-serving recitals of the accompanying bonds to the effect that the obligors therein were the owners of the fisheries so described did not, as documentary evidence addressed to the court, establish the existence of such rights as against the state or demonstrate to the court that the fisheries in question were operated on the *locus in quo*. The most that can be said is that such proof, taken in connection with the very meager oral testimony on the subject, may have presented a question for the jury that it would have been error for the trial judge to refuse to submit to them. Upon this point, however, the plaintiff in error is concluded by the admission of his counsel contained in the following *colloquium* with the court at the conclusion of the testimony:

"The Court—I believe it is agreed there is no question of fact which the jury ought to pass upon?" to which counsel for the defendant in error said: "That is our view of the case," and counsel for the plaintiff in error said: "I cannot conceive why we are not entitled to a direction. It seems to me that the *Court* should determine that question," and then proceeded to argue matters of law the points on which his motion was based. After this motion had been denied the court again asked, "Now is there any question of fact to be submitted to the jury?" to which counsel of plaintiff in error responded that he thought it should be left to the jury to say whether there was a survey of the land prior to 1702, and then added, "I do not think of any question except that."

In view of this double interrogation of counsel and his replies to the court it cannot now be said that a question proper to be left to the jury was erroneously withheld from them, or that from the testimony alone, without the aid of the jury, the trial judge should have held that rights adverse to

the state and covering the *locus in quo* had been established. The testimony, it should be noticed, showed without contradiction that the shore line at the *loqus in quo* had made out eight feet in the past fifteen years, and as there was nothing to show whether or not this process had been going on during the sixty or eighty years that had elapsed since the dates of the fishing bonds in question, the location of the fisheries then in operation with respect to the precise *locus in quo* now in dispute would require testimony of a different character from any that was given or offered.

The attempts of counsel to cross-examine the witnesses of the other side as to fishing operations were overruled, but such rulings merely regulated the order of proof and did not prevent the plaintiff in error from calling such witnesses as part of his own case. The remarks of judges and text-writers cited as historical proof of the existence and incidents of shore fisheries in the Delaware river did not in the slightest degree tend to show the operation on the land in question of the fisheries mentioned in the documentary proof that was offered.

No error of the trial court in dealing with this assignment is disclosed, but to avoid misapprehension it should be added that if error had occurred in this or in the immediately preceding assignment it is not to be conclusively assumed that such error would require the reversal of the judgment recovered in this action of ejectment.

In such actions, when both parties at the trial are claiming title from a common grantor, it is not in general requisite that either should trace his title back of such common source. Such was the case here, where each party claimed under a riparian grant from the state through the Pavonia Land Association. The effort, therefore, of the plaintiff in error to show that the state had no title presents the question we have indicated but which, in view of the conclusion we have reached, we shall not further discuss.

Finding no error that should lead to reversal, the judgment of the Circuit Court is affirmed.

*For affirmance*—The Chancellor, Chief Justice, Garrison, Swayze, Reed, Trenchard, Parker, Bergen, Voorhees, Minturn, Bogert, Vredenburgh, Vroom, Gray, Dill, J.J. 15.

*For reversal*—None.